EMMA B. WILSON, Plaintiff, v. MARY JANE KEATING CALHOUN et al., Appellants.

**CANCELLATION OF INSTRUMENTS:** Fraud—Duress—Undue Influence—Advice of Friends—Threat of Prosecution—Blackmailer. No free mental agency, no deed. A deed may be set aside as for undue influence, fraud and duress when executed by the grantor under the influence and by reason of the urgent advice and solicitation of the grantor's *friends* and *confidants* that he execute the deed and flee the country in order to avoid a prosecution for a crime of which grantor was confessedly guilty, threatened by a blackmailer who, having learned that grantor had committed the crime, was using such knowledge as a leverage to extort money from grantor on a bogus claim. And this is true though the grantor's friends took no advantage by the deed, and though the grantees took no part in the fraud, duress or undue influence.

PRINCIPLE APPLIED: One K forged a note. Later, this was financially adjusted. One L learned of the forgery and fabricated a claim against K and conveyed to K's friends his intention to prosecute K on the forgery charge unless his claim was paid. K's friends and confidants, including his own attorney, found K, placed the matter before him, enlarged on the grave danger he was in, advised and urged him to execute a trust deed to his two minor children and flee from the country. K, much agitated and frightened, was kept concealed until late at night, when he was taken to the attorney's office, the deed was executed, a ticket was purchased for him to a point in a distant state, hats were exchanged, the parties made their way secretly to the train, which the grantor boarded from an alley, and K remained in hiding for some seven months thereafter. *Held,* the deed should be set aside.

**CANCELLATION OF INSTRUMENTS:** Deed—Fraud—Delay in Action to Set Aside—Laches. One must, of course, move with

promptness to set aside his deed on the ground of fraud, but a delay of some eight months in instant case did not render plaintiff guilty of laches.

PRINCIPLE APPLIED:   (See under No. 1.)

*Appeal from Linn District Court.*—HON. MILO P. SMITH, Judge.

FRIDAY, APRIL 9, 1915.

ACTION for the partition of certain real estate owned by Hugh J. Keating, now deceased, at the time of his death. Plaintiff is a daughter of the deceased, and defendants are his administrators and heirs at law, and the holders of a lien upon part of the lands. Plaintiff and defendants Mrs. Calhoun and John H. Keating each claimed an undivided 9/147 interest in the land; and alleged that Winnie Mitchell, Mrs. Cowart, and Mrs. Cook were each the owners of 23/147 of the land; and asked that the other defendants be required to establish their respective interests in the property. Plaintiff and Mrs. Calhoun each asked the reformation of a quitclaim deed which they executed on September 30, 1909, to Hugh J. Keating, a brother, conveying a certain interest in the land.

There is no dispute as to the interests of Mrs. Mitchell, Mrs. Cowart, and Mrs. Cook in and to the lands in controversy. Hugh J. Keating, a son of the deceased, by crosspetition claimed to be the owner of an undivided 51/147, subject to a mortgage given by him to a certain bank, which is made a party defendant. He also claimed that a certain deed made by him to one Pitner, trustee, who is also made a defendant, for the ostensible benefit of Hugh Hubert Keating and Lloyd J. Keating, minor children of Hugh J. Keating, who are also made defendants, was executed on Sunday, and was obtained from him by duress, fraud, and false representations, and undue influence; was without consideration and void; and he asked that the same be set aside and can-

celled. Pitner, the trustee, and one Voris, the guardian for the minor defendants, claimed the share which their father inherited from the deceased under the deed just mentioned, and denied the allegations of fraud, duress, undue influence, etc.

The trial court found that the deed of Hugh J. Keating Jr. to the trustee was obtained through duress and undue influence; and entered a decree cancelling and setting the same aside; and established the interests of the several parties accordingly; and the guardian, Hugh J. Keating, Emma B. Wilson, and Mrs. Calhoun appeal.—*Affirmed.*

*Voris* and *Haas,* for appellant.

*F. L. Anderson* and *C. W. Kepler & Son,* for appellees, and for Mrs. Wilson, Mrs. Calhoun and Hugh J. Keating.

DEEMER, C. J.—Under the pleadings, there is no real issue in the case save upon the deed made by Hugh J. Keating to Pitner, trustee; and this is attacked upon the grounds stated. The trial court found that the deed was obtained through duress, ordered it cancelled and set aside, and allowed an attorney's fee of $200.00 in favor of the attorneys for the guardian, Voris, to be paid out of the share awarded to Hugh J. Keating.

1. CANCELLATION OF INSTRUMENTS: fraud: duress: undue influence: advice of friends: threat of prosecution: blackmailer.

The appeal is from the ruling setting aside and cancelling the deed, and the sole question presented is the validity of that deed. It should also be stated that the trial court refused to reform the quitclaim deeds made by plaintiff and Mrs. Calhoun to Hugh J. Keating, and that these last named parties appealed from this part of the decree; but it is agreed that, if the decree setting aside the trust deed be affirmed, there is no need for considering these last mentioned appeals.

The elder Keating left a wife, two sons, and five daughters surviving. He died in the year 1903; and the son Hugh J. Keating Jr. continued to live upon the land until the death

of the widow, his mother, in the year 1912. In March of the year 1909, Mrs. Calhoun sold to her brother, Hugh J. Keating, an undivided one-seventh of a two-thirds interest in the lands left by the elder Keating, and executed a quitclaim deed to him purporting to convey all her interest in the lands; and in September of the same year, Mrs. Wilson, a daughter, also conveyed to Hugh J. Keating, by the same kind of a deed, her undivided one-seventh of a two-thirds interest and executed a quitclaim deed which purported to convey all her interest in the lands. It is agreed between the respective parties to these deeds that they were intended to convey but an undivided one-seventh of a two-thirds interest in the lands left by their father, and not any interest which they derived from their mother after her death.

After Hugh J. Keating obtained these deeds, he married, and brought his wife to live upon the land involved in this controversy, with the widow, who was then alive, and living upon the premises. Although matters did not run smoothly, these living arrangements continued until the death of the widow in April of the year 1912. Almost immediately upon her death, Hugh's wife commenced an action for divorce against him. Hugh consulted attorneys, and it was agreed that he should pay his wife $3,000 alimony. He claims he was advised that he must have the money at the time the divorce decree was rendered. However this may be, it appears without question that he almost immediately forged the name of an old friend and neighbor, one Lyman, to a note for $3,100, negotiated it with a bank in Linn County, obtained a draft for the amount thereof, which he delivered to his attorney the day before the divorce case was heard and the decree granted.

This decree was granted on Thursday of a certain week, and on that day the $3,000 was paid to the attorneys for the wife. On the next day after negotiating the note, the forgery having been discovered, Keating sent word by his brother-in-law to Lyman to meet him; and on Saturday following the

Thursday on which the divorce was granted, Keating, Lyman, and the cashier of the bank who purchased the note went to Cedar Rapids and there had a conference with some attorneys, resulting in a settlement of the matter.

By agreement, Keating made a deed to the bank to secure the amount of the Lyman note and all other debts which he, Keating, was owing the bank, and to further secure the sum of $200 which he, Keating, was then owing his attorney in the divorce proceeding. It is also claimed that the bank at that time agreed to advance to Keating enough money to take care of all his other indebtedness, the deed to his interest in the land involved in this proceeding to stand as security for all of these amounts. Lyman and Keating then returned to their homes, Keating intending to go back to work for the man in whose employ he then was.

An information had been filed against Keating for the Lyman forgery, and this in some manner became known to a man named La Velle. La Velle claimed that Keating owed him something like $500, and he went to Keating's attorneys and to the banker, Pitner, and told them he would have Keating sent to the penitentiary unless he, La Velle, was paid the $500. Fearing this might be done, Pitner and Keating's attorneys, on the Sunday following the day on which the bank matter was settled, got into an automobile and went out to where Lyman lived and told him of the threats that were made; and Lyman then got into the machine with the other men, and all started in search of Keating, with the idea of advising him to leave the country. Before finding Keating, these men agreed that they would advise him to make a trust deed to the banker, Pitner. They finally found Keating and revealed the story to him, and one or all advised him to leave the country, the attorney telling him that he would have to remain away three years in order to escape an indictment which might be found against him; and he also advised him that La Velle could prosecute him for the forgery and

send him to the penitentiary. Lyman also advised Keating to leave the country.

There is also testimony to the effect that this attorney said to him that he had seen the county attorney, and that if he, Keating, would sign away his property in the manner suggested, he (the county attorney) would not prosecute Keating. After this conference, the parties all started back to Cedar Rapids, Keating stopping on the way to bid his sisters goodbye, saying to them that he was going to leave the country on the advice of his attorney and of his old friend, Lyman. The sisters advised him not to go, but he seemed in a very nervous and excited state of mind, and finally left them, saying, "Goodbye."

There was talk at this time about the execution of some kind of a trust deed to Pitner. When the party arrived at Cedar Rapids, Keating was taken to the home of one of his attorneys, where he remained until about ten o'clock, Sunday night, when he was taken to the attorney's office, and there the trust deed which is the subject of this controversy was prepared, and signed by Keating. He, Keating, says it was signed before midnight, but the other parties present said it was shortly after midnight, and that the signing was purposely delayed until after the stroke of twelve.

While at the attorney's house, Keating said he preferred to deed the property to his sister, Clara, but was advised this would not be legal, and he then said that if this were true, he would deed it to the banker, Pitner. Keating also suggested that he wished to go down in town; that he would like to see La Velle; but his attorney advised him strongly not to go; that "he, La Velle, would have him arrested the first thing."

After they got to the office, his attorney advised him not to write to anybody, not even his sisters; to write to him, the attorney, and he, the attorney, would keep his sisters advised. After the deed was signed, the banker and the lawyers took Keating to the depot by automobile, and at the suggestion of one of the attorneys, he and Keating exchanged hats, in

order to escape detection. One of the attorneys went into the depot and purchased a ticket for Keating, he, Keating, remaining in the automobile until the train arrived, and when it came, Keating took an alley to get to his car. The ticket was purchased for some point in Idaho, and thither Keating went, remaining there in hiding until the following January, when he was discovered by a brother-in-law and his fears allayed.

There can be no doubt, under this record, that Keating signed the deed because of fear of the penitentiary; that he was so frightened as to become a fugitive from justice; and that he was induced to execute the instrument through fear. This deed of trust made Pitner a trustee and directed the trustee to sell all the real estate conveyed, which covered all Keating's interest in the land in controversy—no matter how derived, whether from his father or mother, or by deeds from his sisters—and to pay the proceeds to the grantor's sons, Hugh Hubert Keating and Lloyd J. Keating, when they arrived at the ages of twenty-three and twenty-one years, respectively. If either died before reaching that age, his share was to be paid to the survivor; and if both should die before reaching the age stated, the proceeds should be paid to his sister, Clara Cook.

The trial court found that the deed was executed on a secular day; but was of opinion that it should be set aside because obtained by fraud, duress, and undue influence; and we are constrained to hold that it was right in both conclusions. Even if executed on Sunday, it is not subject to be set aside on that ground alone. *Dorough v. Equitable Mortgage Co.*, 118 Ga. 178; *Shuman v. Shuman*, 27 Pa. St. 90.

The transaction was fully executed, and neither party may rescind and recover the property or the purchase price because the deed was signed and delivered on Sunday. *Kelley v. Cosgrove*, 83 Iowa 229; *Kinney v. McDermot*, 55 Iowa 674.

II. Appellants contend that the trial court was in error

in setting aside the deed for duress, fraud or undue influence, and aver that, as the deed was made for the purpose of hindering, delaying, and defrauding La Velle, who was a creditor of Keating's, he cannot be heard to plead his own fraud and have his conveyance set aside. The claim of La Velle was a mere incident of the transaction. No one of the parties regarded it as valid, and no attention would have been paid it, save for La Velle's threat to prosecute Keating if he did not pay it. It was the threat of the criminal prosecution which induced Keating to act and to leave the country, and not the desire to defeat La Velle's bogus claim. True, there was some talk that La Velle might at some time bring a suit to set the conveyance aside; but the only influence this had was to determine who of several persons should be made the grantee or trustee in the deed. No attempt would have been made to transfer the property, had it not been for the threat of La Velle to prosecute Keating for his crime of forgery. It is not a case where a grantor of property is seeking to take advantage of his own fraud. Keating was expecting to leave the country for good, to escape the threatened criminal prosecution, and the deed was made because he was leaving his interests in real estate which should be looked after.

III. Appellants further say that there was no duress and no undue influence, because no threats were made by the grantees or anyone representing them. It is true that none of the parties who induced the making of the deeds themselves made any threats; and it is also true that they assumed to act as Keating's friends. Some of them were his attorneys; but these facts make the case stronger in some respects than if they had made the threats themselves. Naturally he was the more ready to yield to what they said regarding the threats made by La Velle, and more likely to be affected by them than if La Velle himself had made them in his presence.

Keating's own lawyers, his friend, Lyman, and the banker seemed to be as much or more concerned over them than was Keating himself; and because thereof, Keating was induced

to conceal himself, to leave the country, even against the advice of his sisters, and to make a deed which had never been suggested by anyone until these threats of criminal prosecution came to his ears. It is entirely immaterial that the parties who were with him derived no profit from the transaction. The primary question is the state of the grantor's mind. Was the deed his free and voluntary act, or was it obtained through duress, or undue influence? If the latter, it is not his deed, and it should be set aside although the duress or undue influence was not practiced by the grantees, and the parties making the threats received no benefit whatever from the transaction. Again it is suggested that the threats made by La Velle, communicated by the banker, the lawyer, and the friend to Keating were not of a kind to constitute duress or undue influence, for the reason that these threats were merely to prosecute for a crime of which Keating was in fact guilty. Some of the old cases seem to hold that a threat to prosecute one for an offense of which he is in fact guilty does not constitute duress; but, save in exceptional cases, as perhaps where one wronged by the commission of an offense is entitled to reparation for the wrong, and may compound the offense, the law now regards a mere threat to prosecute one for a crime of which he is in fact guilty as sufficient to constitute duress. See *Bank v. Loos,* 142 Iowa 1, 7, and cases cited. Here, the threat made by La Velle was an unlawful one under any aspect of the case, and when conveyed as it was to Keating by his friends and attorneys, with the suggestion of danger and advice to leave the country, it naturally disturbed his free agency and amounted to undue influence, if not duress. In this connection, it may be observed that duress and undue influence are much alike; the former has been said to be "the extreme of undue influence." *Commercial Nat'l Bank v. Wheelock,* 40 N. E. 636. In either case, however, a contract cannot be avoided unless it controls the free action of the party's will. Again, it is said that the threats must be of an unlawful arrest, and that, as the record

shows Keating was in fact guilty of the crime of forgery, there was no duress. Whatever the rule generally, it appears from the record now before us that La Velle's threat was unlawful, that it was made to induce the payment of a fictitious claim, and not to vindicate the majesty of the law; and under all the cases, such a threat is unlawful, and other things being established, will amount to duress. *Kennedy v. Roberts,* 105 Iowa 521; *Morse v. Woodworth,* 155 Mass. 233; *Fountain v. Bigham,* 235 Pa. St. 35, 29 Ann. Cases, 1185.

As already suggested, it is of no consequence that the parties guilty of the duress or undue influence received no benefit therefrom. A trust deed which is obtained by duress or undue influence is void although neither the trustee nor the beneficiaries participated therein. The reason for this is that the instrument is not the deed of the party making it and is avoidable at his election. *Ewing v. Bass,* 48 N. E. 241; *Smith v. Boyd,* 47 Atl. 816; *Bank v. Bryan,* 62 Iowa 42; *Bank v. Kusworm,* 26 L. R. A. 48, 91 Wis. 166.

Could it be said under the record that the threats of La Velle did not induce Keating to make the deed, it nevertheless appears that these threats, aided by the advice and suggestions of his friends, induced him to do an act which he would not otherwise have done, and unduly influenced him, so that the act of making the deed was not of his own free will, and for that reason it should be set aside.

2. CANCELLATION OF INSTRUMENTS: deed: fraud: delay in action to set aside: laches.

Finally it is argued that Keating was guilty of laches, and that he is not entitled to have the deed set aside because he did not act with that promptitude which the law requires. Under the influence of the threats, Keating left Cedar Rapids surreptitiously and kept his whereabouts unknown until he was discovered by his brother-in-law and brought back to Iowa in January of the year 1913. The trust deed was executed on June 10, 1912, and Keating's cross-petition was filed January 29, 1913. There was no such delay as to defeat Keating's claim under his cross-petition. The record shows

that the influence of the threats upon Keating's mind continued until his brother-in-law went to Idaho and found him in January, and the action was commenced within a few weeks thereafter.

As we affirm the trial court's finding on the issue as to the validity of the Keating deed, there is nothing left to consider. The guardian who appeals in this case represents minor defendants; and but for the fact that he stands in this representative character, we would be disposed to criticize him for bringing the case to this court. The mere statement of the case is the best argument that can be made in support of the decree of the trial court. The facts recited make out a clear case of duress and undue influence, and no other conclusion could reasonably be reached.

Appellant's motion to dismiss Keating's cross-appeal is sustained. The decree is correct and it is—*Affirmed.*

LADD, GAYNOR and SALINGER, JJ., concur.