## SHELTON v. TRIGG et al. (No. 1584.)

(Court of Civil Appeals of Texas. Amarillo. Oct. 13, 1920. Rehearing Denied Jan. 5, 1921.)

1. Partnership &#9901;83 — Contract held not to authorize supervising partner to discharge his copartners and to charge firm for performing their duties himself.

In an action for an accounting by two members of a ranching partnership brought against a third member, who was to finance the business, the partnership contract, though it gave defendant the right to supervise and control his partners and to employ other men if plaintiffs became incapacitated, *held* not to authorize him to discharge plaintiffs and to substitute himself and charge the partnership for performing plaintiffs' duties; the contract expressly providing that no partner should be entitled to compensation for performing the duties imposed on him.

2. Partnership &#9901;83—Exaction of salary by member under threat of exercising his contractual rights held duress making member liable to account.

Where a partnership contract gave defendant partner an absolute right to dispose of the partnership property and to dissolve the firm at his option, and also gave him absolute control over the other partners, but provided that no partner should receive compensation for work performed for the firm, defendant's actions in threatening to dispose of the partnership property and to dissolve the firm if he were not paid a salary for doing the work of the other partners whom he had discharged *held* to constitute duress, and to make him liable for an accounting for salaries so paid; defendant's threat to exercise a contractual right to accomplish an illegal purpose rendering the threat illegal.

3. Partnership &#9901;83—Partner exacting salary under duress held not entitled to retain it in equity and good conscience.

Where defendant partner had by duress exacted a salary from the partnership for his services, contrary to the terms of the contract, by threatening to exercise his contractual right of disposing of the partnership property and of dissolving the firm, he was not entitled in equity and good conscience to retain the salary paid, within the rule that to recover moneys paid under duress it must be shown also that it was against equity and good conscience for the payee to retain it.

---

&#9901;For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**4. Contracts ⊕95(3)—Test as to what constitutes "duress" by threats stated.**

The test as to what constitutes "duress" is not so much the nature of the threat or the words used but the effect of the threat on the mind of the servient party, it being the duty of the court to take into consideration the standard of the individual affected and all the surrounding circumstances, and when it appears that agreement was under restraint, that the parties were not dealing at arm's length, but that its execution was the result of the choice between two evils, a court of equity will refuse to enforce the contract and decree recovery of money if paid thereunder.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Duress.]

**5. Estoppel ⊕59—Partners held not estopped to claim accounting by third partner for salaries paid under duress.**

In an action for an accounting brought by two members of a partnership against a third to recover salaries paid under duress, consisting of threats by defendant to dispose of the partnership property and to dissolve the firm, under the terms of the contract, plaintiffs *held* not estopped where the conditions whereby defendant was enabled to coerce them by the threatened sale of the property continued until after the payments were made.

**6. Partnership ⊕328(3)—Evidence sustaining finding of want of consideration for salary and dissolution contracts between partners.**

Where defendant member of a partnership under duress exacted a salary for his services in violation of the partnership contract, and subsequently forced plaintiffs to enter into a dissolution agreement, a finding that there was no consideration for the salary contract or the dissolution contract *held* sustained by the evidence.

**7. Partnership ⊕83—Salary contract obtained by one member by duress held not ratified.**

In an action by two members of a partnership against a third for an accounting as to salaries exacted by such third member under duress contrary to the terms of the partnership agreement, evidence *held* to show that plaintiffs did not ratify defendant's actions, since a contract obtained under duress cannot be ratified by the servient party unless the so-called ratification is after all pressure and coercion have been removed.

**8. Pleading ⊕430(2)—Evidence of threats in action for accounting, though not in exact words pleaded, held admissible in absence of exception or objection.**

In an action by two members of a firm against a third for an accounting as to salaries paid to such third member under duress, evidence as to a threat made not in the exact words alleged in the pleading held admissible in absence of exception or objection, and a judgment entered thereon was not fundamental error.

**9. Partnership ⊕83 — Service of substitute wrongfully appointed held no consideration for promise to pay therefor.**

Where a member of a partnership wrongfully discharged the other members and substi-

tuted himself, making a charge for his services, notwithstanding the contract provided that no partner should make such charge, the services of such substitute *held* not a consideration for a promise to pay therefor made by the remaining partners under duress.

**10. Partnership ⊕83—Partners not liable for services rendered by member acceptance of which was brought about by duress.**

Where two members of a partnership under duress exercised by a third promised to pay for services rendered by such member in violation of the partnership agreement, such members were not liable to pay therefor as upon an implied contract.

**11. Partnership ⊕83—Consent to dissolution held not consideration for salary stipulation contrary to partnership agreement.**

Where a partnership agreement provided that a dissolution might be had only on consent of one member, such consent *held* not a consideration for an agreement to pay a salary to such member, contrary to the partnership contract, where the agreement was made under duress; plaintiffs not regarding such consent as consideration.

**12. Partnership ⊕329—Evidence held to justify submission of partner's claim for subsistence to jury.**

In an action for a partnership accounting, evidence of payment of $40 by plaintiffs to defendant, under an alleged agreement that the firm should no longer pay the subsistence account of one of the partners, *held* not to make a refusal to direct a verdict for defendant as to the allowance of such claim erroneous on the ground of estoppel.

**13. Partnership ⊕327(6) — Evidence as to execution of partnership articles held inadmissible under pleadings in action for accounting.**

In an action for partnership accounting, where duress as to certain payments exacted by defendant was charged, and where it appeared that the partnership contract was highly advantageous to defendant, evidence as to the reason why plaintiffs entered into the partnership agreement, and implying oppressive and unfair conduct on defendant's part, *held* inadmissible, where plaintiff had not by the pleadings attacked the articles of partnership in any way.

**14. Partnership ⊕329 — Instruction as to right of dissolution in partnership accounting held properly refused.**

In an action for partnership accounting, where the partnership articles gave defendant the sole right to demand dissolution, it was not error to refuse to instruct that for plaintiffs to legally demand dissolution on the ground of disagreement the disagreement must have been such as to make a continuance of the partnership unprofitable.

Huff, C. J., dissenting in part.

Appeal from District Court, Potter County; Henry S. Bishop, Judge.

Suit for partnership accounting by D. C. Trigg and another against J. M. Shelton.

---

⊕For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Judgment for plaintiffs, and defendant appeals. Reversed and remanded.

Hendricks & Mood, of Amarillo, and Coffee & Holmes, of Miami, for appellant.

Kimbrough, Underwood, Jackson & Simpson and Miller & Guleke, all of Amarillo, for appellees.

HALL, J. This is an action for a partnership accounting brought by D. C. Trigg and his son, S. L. Trigg, against appellant, Shelton. The parties entered into a partnership in the month of July, 1912, purchasing from the Freehold Land & Cattle Company, Limited, hereafter called the syndicate, certain live stock and leasing certain lands belonging to the syndicate. The memorandum agreement between the partnership and the syndicate provides, in substance, that the syndicate agrees to sell to the partnership all the cattle, horses, and mules located on its ranch in the counties of Dallam, Hartley, Oldham, and Deaf Smith, there being approximately 22,000 head of cattle and 400 head of horses and mules. The contract provides for the delivery of the live stock on or before the 1st day of November, 1912, with the privilege of gathering and delivering any remnant of cattle on or before May 1, 1913. It further provides that the partnership shall pay for all cattle delivered at the rate of $37 per head, but that unmerchantable cattle and the calves of 1912 are not to be counted; that horses and mules shall be paid for at $60 per head, payment for the live stock to be made as follows:

"The sum of $50,000 in cash upon execution of this contract and the sum of $200,000 in cash on November 1, 1912, the balance to be evidenced by five notes of equal amounts, executed by (the partners) jointly and severally, payable to the syndicate in whole or in part on or before the 1st day of November of each year for five successive years, beginning with November 1, 1913, with interest thereon from November 1, 1912, at the rate of 6 per cent. per annum, interest payable annually."

There are other stipulations with reference to the execution of a deed of trust upon the property, sale of the purchased property by the partnership, the payment for cattle to be subsequently delivered and the branding of the same, not necessary to be set out. The contract further provides that the syndicate shall lease to the partnership for a period of five years and four months from January 1, 1913, approximately 600,000 acres of land, situated in the above-named counties, at the rate of 10 cents per acre per annum, the rent to be paid quarterly. It is further provided that the partnership shall keep all buildings, fences, wells, windmills, etc., upon the leased premises in repair at the expense of the partnership, except that the materials for repairing wells, windmills, and drinking tubs should be furnished by the syndicate at its expense. The partnership is given the privilege of subletting any part of the leased premises, but is to be held responsible to the syndicate for the payment of the rent due the syndicate on all lands subleased. The partnership is to have the free use of all tools, farming implements, repairing outfits, and wagons located on the premises, with certain exceptions named. This contract purports to have been executed in the month of July, 1912, the exact date being left blank. On the 31st day of July, 1912, the written contract of partnership as entered into between appellant, Shelton, and D. C. and S. L. Trigg is as follows:

"State of Texas, County of Potter.

"This memorandum of agreement witnesseth:

"Whereas, J. M. Shelton, of Wheeler county, Tex., party of the first part in this contract, and D. C. and S. L. Trigg, of Carson county, Tex., parties of the second part in this contract, have this day by written instrument entered into a contract with the Capitol Freehold Land & Investment Company, Limited, for the purchase of certain cattle and other personal property and for the leasing of certain lands therein described, and to which reference is hereby made for a more particular description, and also referring herein to covenants and stipulations therein expressed as to the liability of the parties herein mentioned upon that contract; and whereas, the parties of the first and second parts are desirous of conducting a ranch and cattle business under the firm name of Shelton & Trigg, it is agreed and stipulated as follows:

"First. That the said parties of the second part are to contribute their work and labor under the direction and supervision of the said party of the first part in the handling of the ranch business of the said Shelton & Trigg, and in taking care of said cattle upon the range, and conducting said business as to the details with their best skill and labor, without any cost whatever for such services during the term of said partnership.

"Second. Said party of the first part is to furnish the sum of $250,000, $50,000 to be paid to the Capitol Freehold Land & Investment Company, Limited, of even date herewith, and the sum of $200,000 on the 1st day of November, A. D. 1912, and said parties of the second part hereby promise to pay to the said party of the first part the sum of $125,000 and to be liable jointly and severally to the said J. M. Shelton for the principal and interest, with interest from the date of such payments by parties of the second part at the rate of 8 per cent. per annum until paid, interest payable semiannually, first note maturing five years from date, second note to be executed the 1st day of November, 1912, for the sum of $100,000, maturing the 30th day of July, 1917, but all to mature also under the stipulations and conditions of this said contract in the event of a winding up of the affairs of said partnership or a sale from either party to the other; same to be secured by chattel mortgage of date of second note upon the interest of the parties of the second part in the lease of the Capitol Freehold Land & Investment Company, Limited, to the contracting parties herein, and upon

the cattle and horses and all personal property purchased by them and described in contract of said corporation to the said parties herein named, and the said chattel mortgage executed by the said parties of the second part to the said J. M. Shelton, party of the first part, upon said property mentioned, is also covered by advances made by the said J. M. Shelton, party of the first part, either to the said parties of the second part or for the benefit of said partnership, to be closed and evidenced by note of the parties of the second part, with interest, and said chattel mortgage is to further cover their interest in all other personal property of whatsoever nature and wheresoever situated for the benefit of the said J. M. Shelton, whether owned or possessed now or acquired and brought into the partnership assets in the future.

"Third. Said J. M. Shelton is to have the sole and exclusive management of the affairs of said partnership and of said property of said partnership assets over said parties of the second part, and no cattle or other personal property are to be sold by either of said parties of the second part or jointly without the consent of the said party of the first part, and the said control of all matters with reference to the partnership affairs is extended to any detail in actual handling and management of the affairs of said ranch and of the cattle upon the same, with the same unlimited control by the said J. M. Shelton, whenever he desires to exercise said right, to employ and discharge men upon the ranch; and it is further agreed if at any time either or both of the parties of the second part shall become incapacitated by sickness or otherwise, or refuse to contribute the adequate amount of work and labor under the supervision of said party of the first part for the handling of said ranch business, or in the event of the death of either or both of said parties of the second part, said party of the first part is to have the right to employ any other man or men to take the place of said parties of the second part, at the expense and liability of said parties of the second part, or their estate, in accordance with the condition creating the necessity for such substitution; and it is further agreed that in the event of the death of either party of the second part, or both, the said J. M. Shelton will still have the sole and exclusive management and control as surviving partner of said property, without any interference from the administrator, representative, heirs, or assigns of either or both of said deceased partners, in winding up the affairs of said partnership as surviving partner, dispose of the assets, pay the debts, including all of the expenses of the handling of said business, with the right to retain the proper amount for the payment of any liabilities by the parties of the second part to the party of the first part, and the balance, if any, to be paid by party of the first part, to the proper representatives of the parties of the second part.

"Fifth. It is further agreed that, in the event of the death of the said party of the first part, the administrator, executor, or representative, under the law, of his estate, will have the same right and the parties of the second part hereby extend the same privilege to said administrator, executor, or personal representative as is enjoyed by him, the said party of the first part, under this contract, that is, to have the same management and control with the same

obligations and liability to said executor, administrator, or personal representative, as stipulated for in favor of said party of the first part, under the terms of this said contract.

"Sixth. The said party of the first part will have the right, at any time, to reduce the holdings of the partnership, sell any part of the horses, cattle, or other personal property and sublease any part of the land, without the concurrence or agreement of the parties of the second part, and will have the further right, at any time he may deem expedient, to sell all of the cattle and holdings of the partnership and wind up the affairs of the partnership, pay the debts, retain the amount due and owing to him by either or both of said parties of the second part, and distribute whatever proceeds either or both of the parties of the second part may be entitled to after the affairs of same have been wound up by the said party of the first part.

"Seventh. It is further agreed that the right of the said party of the first part with reference to the winding up of the affairs of said partnership is to take precedence and priority, if exercised at any time by the said party of the first part, over any attempted dissolution made by the parties of the second part.

"Eighth. It is further agreed that at any time, if the said party of the first part has not exercised his right to wind up the affairs of said partnership, as defined in paragraph No. 7, and either of the parties hereto desires to sell his or their interest to either party or parties or to purchase the same, the said parties hereto will agree upon the value of their said interests in said partnership property, and the party of the first part or the parties of the second part will either sell or purchase the other said interest upon a price agreed upon by the said partners, and in the event of a failure of agreement for said purpose the parties of the second part will appoint one person and the party of the first part will also appoint one person, and those two will appoint a third person, to pass upon the valuation of the interests of each of the parties hereto, that is, the parties of the second part together and the party of the first part, with the right of the party of the first part to either sell or buy upon the said agreed valuation, whether made by the partners or by the arbitrators, and upon the payment of the amount agreed upon all the title and interest in the parties of the second part are to pass to the party of the first part, upon the payment of said purchase money, in the event he purchases said property.

"Ninth. It is further agreed that, if the party of the first part agrees to take the price agreed upon and sell to the parties of the second part his interest in the partnership assets, he is to receive the cash for the same, or if upon terms the sale is to be made with such security as is agreeable to the party of the first part for the divestiture of his said interest.

"Tenth. It is further agreed that this partnership is for the term of five years, unless sooner terminated, for the purpose of either buying, selling, or raising cattle, and the partnership, by the selection of the party of the first part, is to have a competent bookkeeper for the purpose of keeping the books and detailing the transaction and business for said partnership during the term of the same.

"Eleventh. It is further agreed that the par-

ty of the first part may sell any and all of the cattle during the term and existence of said partnership and substitute other cattle, by purchase, for the cattle disposed of, and all of said acquisitions by him for the said partnership are to be embraced, so far as ownership, interest, and right in same are concerned, under the same terms, stipulations, and obligations to this partnership as the said property so sold.

"Twelfth. It is further agreed that the said party of the first part is to have the right, if said cattle are sold, to apply said money to whatever obligations the said parties of the second part may owe, or that the partnership may owe, or for reimbursement to him for any moneys advanced for expenses, and in the event of dissolution is to have the right of distribution of the net proceeds to said second parties.

"Thirteenth. It is further agreed that, in the event of any disagreement with reference to the manner of handling or conducting said ranch, either general or in any detail whatever, direction and authority of the said party of the first part are to be final and decisive in any such matter in dispute.

"Fourteenth. It is understood that the parties of the second part, as one part, and the party of the first part to this contract, are of equal interest in said partnership, and the profits and losses are to be shared and borne equally under the stipulations and conditions of this said contract."

In addition to the written articles of partnership it was alleged and proven that the parties orally agreed that Shelton should, without charge, devote his time and efforts to financing the affairs of the business and exercising a general superintendence over it; that D. C. Trigg should have the general management and conduct of the business under the supervision of Shelton, and that S. L. Trigg should act as foreman of the ranch and be charged with the handling of the cattle and ranch operations, together with the direction of the ranch hands and laborers to be employed; that none of the partners should make any charge for their time or services; that S. L. Trigg should have the subsistence of himself and family at the expense of the partnership, as did ranch employees engaged in such work generally, and as was the custom in respect to ranch foremen in Western and Northwestern Texas, particularly in the Panhandle of Texas, where the partnership ranch is situated.

On January 5, 1914, the partners entered into the following agreement:

"This memorandum of agreement this day made and entered into by and between J. M. Shelton, as party of the first part, and D. C. Trigg and S. L. Trigg, as parties of the second part, witnesseth:

"Whereas, the said J. M. Shelton, as party of the first part, and D. C. and S. L. Trigg, as parties of the second part, by a written contract, dated July 31, 1912, entered into a partnership for the purpose of carrying on a ranching and cattle business, and by the terms of said agreement the said D. C. and S. L. Trigg agreed to give their time and labor under the direction of the said J. M. Shelton in the conduct of said business, and it was at the time of the making of such contract in the contemplation of said parties that it would not be necessary for the said J. M. Shelton to give any considerable portion of his time and labor to the management of the said business; and whereas, it has been agreed that the said D. C. Trigg shall be relieved from the obligation to contribute all of his time and labor to the handling of said business, and the duties of the management and supervision of said business will require much more of the time and attention of the said J. M. Shelton than was originally contemplated by the parties to said contract, at the time of its execution:

"Now, therefore, in consideration of the premises, it is hereby agreed by and between said parties that the said D. C. Trigg is hereby released from the agreement on his part as contained in the paragraph numbered first in the said contract, whereby the said D. C. Trigg agreed to contribute his time and labor in the conduct and handling of said business, and also released from the liability to pay for a substitute as provided in the third paragraph thereof; and it is further agreed that the said J. M. Shelton shall, from and after the 1st day of January, 1914, until said business is wound up, under the terms of said contract, receive as compensation for his services in supervising and managing said business the sum of $7,500 per annum, to be paid out of the partnership assets when said business is wound up.

"This agreement shall not in any wise alter or modify said partnership agreement of July 31, 1912, except as herein expressly stated, and is to be construed in connection therewith."

On the 14th day of January, 1916, the parties entered into what are designated dissolution and partition contracts. The first recites briefly the terms of the articles of partnership, and by way of preamble that whereas the parties are desirous of dissolving the partnership and making partition of the property under the terms and conditions of the articles of partnership, that until the final consummation of the dissolution and partition contracts the terms of the partnership agreement shall remain in full force and effect, and the rights of the parties shall be governed thereby in the event the dissolution is not finally consummated. They provide that the partnership shall cease upon the final division of the partnership property or on or about the 1st day of December, 1916, and that if the dissolution is effected the salary to be paid Shelton shall cease from and after the 1st day of October, 1918, reserving to Shelton the right to pay himself such salary from the 1st day of January, 1914, out of the firm assets. The contracts then enter into the details necessary to be observed in the matter of dissolution and partition, such as rounding up, branding live stock, and dividing the real estate, and the payment of the expenses incident

thereto; and with reference to the rents it is provided, in substance, that Trigg and son shall pay the rents upon that part of the real estate allotted to them through Shelton, and that repairs for windmills shall also be ordered and handled through the office of Shelton at Channing. There are many other minor details provided for, which it will not be necessary to notice in connection with the issues presented by this appeal. By section XI, it is provided that after final division of the property all partnership liabilities shall be paid, and at such time the books of the company shall be audited and a full settlement of all partnership matters shall then be made, to which any funds remaining on hand are to be equally distributed, one half to Shelton and the other to Trigg and son. Of the lands not subleased 165,000 acres were set apart to Shelton and the remaining 200,000 acres to D. C. and S. L. Trigg. Both contracts were based upon estimates of the amount of live stock and real estate in possession, and the right is reserved, upon ascertainment of the correct amount, to partition the property in the same ratio.

The pleadings are voluminous, and only such portions as are necessary in determining the matters to be considered will be stated. The case was tried upon amended pleadings containing general and many special exceptions. None of the exceptions, however, were passed upon by the court. The portions of the amended petition necessary to be set out here may be briefly stated as follows: It is alleged that Shelton was to furnish $250,000, of which $50,000 should be paid to the syndicate at the time the syndicate contract was made, and $200,000 on November 1st, following, and according to the terms of the contract with the syndicate the property leased and purchased was to be delivered to the partnership; that of said $250,000 the plaintiffs were to pay the defendants the sum of $125,000, all other sums due the syndicate to be paid out of the partnership funds, the petition alleging that said payments were made both to the defendant and to the syndicate, accordingly; that plaintiffs executed their notes to defendant for their one half of the $250,000, i. e., one note for $25,000, due July 31, 1912, and the other for $100,000, on November 1, 1912, both of which were paid to defendant before the dissolution of the partnership. Other allegations with reference to the partnership articles were made, which are unimportant. It is also alleged that at the time the partnership contract was made plaintiffs were and long had been ranchmen, owning lands in Carson and Potter counties, and engaged in conducting a farm and ranch business; that the defendant was a banker at Shamrock and owned certain farm and ranch lands in Wheeler county, upon which, through employees, he was engaged in farming and conducting a ranch; that it was understood that the partnership should not include plaintiffs' Carson and Potter county business or defendant's banking and ranch business in Wheeler county; that in arranging to carry out the partnership contract it was orally agreed that defendant should, without charge devote his time and efforts to financing the affairs of said partnership and exercising a general superintendence of the business; that plaintiff D. C. Trigg should have the general management and conduct of the business under the supervision of defendant, and that S. L. Trigg should act as foreman of the ranch and be charged with the handling of the cattle and ranch operations and the direction of the ranch hands and laborers to be employed; that none of the partners should make any charge for their time or services; that the plaintiff S. L. Trigg should have the subsistence of himself and family at the expense of the partnership, as did ranch employees engaged in the work of the ranch, and as was the general custom in respect to ranch foreman in Western and Northwestern Texas, particularly in the Panhandle of Texas, where the partnership ranch is situated; that in pursuance of these arrangements plaintiffs moved upon the land and premises and entered upon their duties, defendant, Shelton, living at that time in Shamrock, but later moving to Amarillo, where he has since resided; that the business of the partnership was being actually carried on by plaintiffs in this manner and was properly, competently, and faithfully carried on by the plaintiffs, in accordance with the division of the work and duties above set forth, and that plaintiffs were conducting the business very successfully, making profits for the partnership, and so continued about six months, when the defendant began to object to purchases made by plaintiffs for the subsistence of plaintiff S. L. Trigg and family; that defendant first objected to certain articles as being unnecessary, and finally wrongfully and in violation of said contract forbade the plaintiffs, or either of them, from making any purchases at the expense of the partnership for the subsistence of the plaintiff S. L. Trigg and his family, and persisted in such prohibition for the remaining period of the partnership, and plaintiffs were compelled to and did purchase supplies for Trigg and his family for the remaining period. It is alleged that plaintiffs bought supplies for S. L. Trigg and his family from October 1, 1913, to December 1, 1916, amounting to $2,400; that the supplies so purchased were reasonably necessary for the subsistence of S. L. Trigg and his family and that the prices shown in the exhibits were the reasonable and customary prices of such goods at the time they were purchased; and plaintiffs therefore claim an allowance of $2,400 in settlement of the partnership account; that

notwithstanding the defendant was not entitled to make any charge for any services he might render in connection with the partnership business, the said partnership having proven exceptionally profitable and successful under plaintiffs' management, the defendant, desiring to take the whole business into his hands and excluding plaintiffs, on or about April 1, 1913, began to make complaints of the manner in which D. C. Trigg was discharging his duties and sought arbitrarily, under the exercise of defendant's powers of management and control contained in the articles of partnership, to exclude the said D. C. Trigg from any share in the management of the business, and did, on or about said date, compel said D. C. Trigg to remove from said premises and discontinue the management and control of the business; that defendant employed additional assistance and took over the management of said business wrongfully and arbitrarily and without excuse therefor; that he did this for the purpose of increasing his own profits and contrary to the written articles of partnership and the supplemental oral agreement; that in pursuance of said design defendant, about January 1, 1914, demanded of plaintiffs that he should be allowed a salary of $7,500 per year for his services in the management and control of said business, and that without any increase of or addition to his obligations or duties with respect to said partnership, or any demand therefor by plaintiffs, they being at all times ready and willing to go forward with said partnership according to said written articles of agreement and said oral agreement; that defendant, to enforce his demand for said salary, threatened plaintiffs that if they refused to assent thereto he would sell all the property of the partnership and make settlement with plaintiffs upon his own terms; that at that time defendant had a mortgage with power of sale upon the interest of plaintiffs in all of the partnership property, and a lien upon all their other property, which they were required to give and had given or contracted to give, so that it became at all events an equitable lien upon that property to secure their indebtedness to defendant in said sum of $125,000; that the defendant had the power under said mortgage to dispose of the entire interest of plaintiffs in said partnership, and they are compelled, under the written agreement dated about January 5, 1914, to agree to the payment to said Shelton out of their interest in said partnership business the sum of $3,750 per annum as salary for his services, being a payment of $7,500 a year to him out of the partnership assets; that this agreement was not only obtained from them by duress of their property but also was without consideration, for both of which reasons it was void and without legal effect, and was further fraudulent and void because ob-

tained in violation of the good faith and fair dealing due from defendant to plaintiffs as partners in business.

Plaintiffs further allege that about January 1, 1916, they paid defendant the entire balance of indebtedness due him, and that about January 14, 1916, they entered into the dissolution and partition contracts, which provided, among other things, that the partnership should terminate upon the completion of the division of the partnership property on or about December 1, 1916; that defendant, in making said dissolution contract, still having and claiming to have it in his power under the original articles of partnership arbitrarily to wind up said partnership, sell the property, and make such distribution as he saw proper, insisted, when providing for the division of the partnership, upon the insertion in said dissolution agreement of a stipulation providing that he should have the right to pay himself a salary of $7,500 a year from the 1st day of January, 1914, to the 1st day of October, 1916, out of the partnership funds; that having all partnership assets and books in his hands, and being in position to make sacrifice of the interest of the plaintiffs in said partnership property by making sale thereof at a sacrifice price, for the purpose of winding up the partnership affairs, as he claimed the right to do at any time and as he threatened to do, plaintiffs were forced to agree to the insertion of said clause in the dissolution agreement under duress of their property, but that under said dissolution agreement they received no greater division of the property than they were entitled to under the original articles, and there was no advantage or consideration whatever for such stipulation; that said stipulation was for both reasons null and void; that under the same circumstances the defendant insisted upon inserting, and the plaintiffs were compelled to permit him to insert, in said dissolution agreement, a stipulation that the three and four year old steers at the north camp and about 1,000 head of the old cows should be cut out and held separately as the work of dividing the cattle should proceed and should not be divided until all the other cattle were divided, and that, in the event there should not be sufficient funds of the partnership in the hands of the defendant to pay and discharge all partnership liabilities, said 1,000 head of cows should be sold and the proceeds placed in the partnership funds, which were under the control of the defendant; that the division of the cattle began as stipulated on or about October 1, 1916; that about said date defendant demanded that 1,000 head of cows be cut out and not divided but held to be sold as partnership assets for the purpose of raising funds to pay defendant out of the partnership assets the sum of about $21,000, which he claimed under said pretended con-

tract of January 5, 1914, and in order to prevent the sacrifice of said cows plaintiffs were forced to and did, but under protest, put up in escrow, in the bank in Amarillo, their check in favor of the defendant for the sum of $10,312.50, to be held until the 1st day of November, 1916, and then delivered to defendant, which plaintiffs did under strict protest; that defendant collected said check and thereby appropriated $20,625 of the firm assets to pay the salary claimed by him under said contract; that said salary contract and the stipulation for its payment in the dissolution agreement and the deposit of said check under protest were all obtained under duress and in violation of the good faith and fair dealing required of one partner toward another, and were fraudulently obtained from plaintiffs by defendant; that said payment was made without consideration and was obtained fraudulently under duress of property and void.

It is further alleged that the dissolution agreement provided that after the division of the partnership property an audit of the books and accounts of the partnership should be had and full settlement made between the parties; that said division was completed about December 1, 1916, and settlement should have been made at that time, but defendant, having all partnership assets and books in his hands, and having the partnership funds deposited in his bank at Shamrock, has hitherto refused and still refuses to make final settlement and accounting to plaintiffs; that, among other items, the defendant has failed and refused to settle his allowance for the expense incurred by them for the subsistence of S. L. Trigg and family in the sum of $2,400, or in any other sum; that he has refused to allow them the said sum of $20,625, which he unlawfully appropriated to his own use out of the partnership funds as salary, or plaintiffs' one-half thereof, $10,312.50. There are numerous other items claimed by plaintiffs which will be omitted, although the evidence bearing upon them, and incidentally bearing upon the issues to be considered, will be hereafter stated when required. Plaintiffs further allege that duing the continuance of the partnership, at a time when defendant was under the obligation of devoting his time and ability to partnership property, he bought land adjoining in part the leased lands of the partnership and known as the J. J. ranch, and also acquired 120,000 acres, known as the Bravo ranch, upon which he undertook to conduct a ranch and cattle business, pretending to pursue for himself individually on said lands so acquired exactly the same business which the partnership was pursuing on the leased premises, and in competition therewith; that in carrying on the business of his said Bravo and J. J. ranches he used the employees of the partnership, together with the farming and ranch implements, horses, wagons, and other facilities, and used the firm bookkeeper, all against the wishes of plaintiffs. The prayer of the petition is that plaintiffs have judgment for an accounting against the defendant, in which defendant be charged with the several items set forth and for costs, and general relief.

The amended answer, after a general denial, specially denies the facts alleged by plaintiffs relating to the salary of $7,500 per annum, and alleges that the contracts providing for the payment of said salary have been in all respects ratified and confirmed by plaintiffs in accepting the fruits of the dissolution contracts and a division of the property made thereunder and in claiming rights and paying money in accordance with their provisions; that, as to said salary having been obtained by defendant under duress of property, such payment has been in all things ratified, acquiesced in, and confirmed by plaintiffs. It is further alleged in regard to the claim of $2,400 paid by plaintiffs for the sustenance of S. L. Trigg and his family that the contracts of dissolution and partition contemplated and intended to embrace the settlement of all partnership affairs upon a valuable consideration, the same being upon mutual agreements as therein shown and having been made prior to the time the original contract of partnership was to end according to the five-year term stipulated therein; that said contracts also contemplated and intended to include all items of liability owing by each individual partner to the firm, and the adjustment thereof, and after a partition of the property the payment or accounting of all demands of each to the firm, if any existed; that they also contemplated a division of the profits already in excess, if any existed, as a final and complete settlement and dissolution; that they embraced and were intended as a settlement of all the affairs of the firm with its increase and growth and the demands arising from the conduct of the business; that defendant, at the time of the execution of said dissolution and partition contracts, had no notice of any claims of such character against him, and he would not at said time have entered into said contracts if he had known that plaintiffs then entertained any such claims; that plaintiffs well knew that said defendant at said time was not aware of any such claims and that he would not have entered into said contracts if notified thereof; that after the execution of the contracts the parties, in pursuance of their terms, proceeded to carry out and execute the same and divide the leased land, cattle, and other personal property, in the fall of 1916, including the proceeds of the sale of the personal property; that in accordance with said contract the books were audited, certain matters were submitted to arbitration, and items of claims were respec-

tively set up by each of the partners and considered by them in the process of settlement; that the institution of this suit was the first notice defendant had of any such claims; that the item of $2,400 for sustenance of S. L. Trigg and family was not included but excluded, except as to the sustenance of S. L. Trigg while at work with the outfit or on the ranch the same as other employees; but, if there was any doubt as to the contractual rights of the parties relative thereto, defendant further says that in the year 1913, at a time when D. C. Trigg was in charge of the management of said ranch under the general supervision of defendant, they had a settlement of such individual items of expense placed in the partnership account which could be picked out from the grocery bills of general supplies bought for the firm, and that at said time defendant was paid for such items, which were apparent could not be charged to the firm, but that other items of general supplies were not settled for, for the reason that such other items mingled with the whole bill of general ranch groceries and supplies could not be separated from the general account and ascertained; that at said time it was agreed between defendant and D. C. Trigg, acting for Trigg & Son, that no more items for supplies of any character for the sustenance of S. L. Trigg and family thereafter be charged against the partnership, which agreement S. L. Trigg ratified; that if at the time of the execution of the dissolution contract plaintiffs intended to make any such claims against defendant as are referred to above, they secretly withheld the same, and well knew that defendant, if any such claims had been made or were contemplated by them, or thereafter intended to be made against said defendant, would not have executed said contracts; that thereby plaintiffs fraudulently obtained the contracts of dissolution and partition, which they would not otherwise have obtained; that at that time the stipulation for the salary was not questioned and no protest was made by plaintiffs, or either of them; that if the salary contracts executed in January, 1914, were influenced by improper acts or declarations of defendant, he says that the contracts of January, 1916, were freely and voluntarily executed by them in all respects, based upon mutual considerations to each of the parties and under conditions wherein the rights of plaintiffs were fully protected and defined and at a time when such influence could not exist, by reason of which facts the latter contracts fully ratified and confirmed the salary contract of January, 1914.

Supplemental pleadings were filed, which do not materially change the issues drawn by the pleadings outlined above, and they will not therefore be stated. The case was submitted to a jury upon special issues, the substance of the findings being as follows:

226 S.W.—49

That plaintiffs (1) executed the salary contract of January 5, 1914, under duress; (2) that they executed the dissolution and partition contracts of January 14, 1916, under duress; (3) that D. C. Trigg put up the salary check October 1, 1916, under duress; (4) that the defendant agreed with plaintiffs that the partnership should pay the sustenance expenses of S. L. Trigg and family; (5) that in 1913, when D. C. Trigg paid to Shelton the sum of $40 for certain articles selected from the ranch account for merchandise, it was not agreed between them that the partnership would not thereafter pay the living expenses of S. L. Trigg and family on the ranch; (6) that plaintiffs paid for articles reasonably necessary for the sustenance of S. L. Trigg and family during the pendency of the partnership, at reasonable prices, $1,479.50; (7) that defendant did not agree that he would not employ any of his kinsmen to work for the foreman; (8) that plaintiffs objected to the employment of Exum (defendant's kinsman) by the defendant; (9) that Exum's services to the firm were reasonably worth the salary paid him by the partnership; (10) that plaintiffs did not freely and willingly pay Exum's salary; (11) that they did not ratify the act of defendant in employing him; (12) that plaintiffs are not estopped to claim and demand (a) the subsistence claimed for S. L. Trigg and family, (b) the salary claim paid to Shelton, (c) the salary paid to Exum, (d) the damage claim by reason of the fire that burned the grass prior to the execution of the dissolution contract, (e) the claim for the loss of any cattle alleged to have been burned on account of the fire; (13) that the dissolution contract of January 14, 1916, was executed by plaintiffs without consideration; (14) that the defendant arbitrarily refused, without the consent of plaintiffs, to allow payment to be made by the partnership for the subsistence of S. L. Trigg and family after April 1, 1913; (15) that the salary contract of January 5, 1914, was without a valuable consideration; (16) that there was a disagreement between the plaintiffs and defendant in regard to the manner of feeding the cattle during the winter and spring of 1916; (17) that the defendant, in determining the subject of that controversy, exercised his best judgment in good faith; (18) that D. C. and S. L. Trigg were entitled to recover against defendant the salary items in the sum of $10,312.50, and the sustenance account of S. L. Trigg, in the sum of $739.78. There are other numerous small items found in favor of plaintiffs and some uncontested items in behalf of defendant. After crediting the total of the items found for plaintiffs with the sum of the items found for defendant, the court, upon plaintiffs' motion, rendered judgment in their favor in the sum of $11,521.70.

The parties have favored us with exhaustive briefs upon the questions submitted here.

Appellant's first assignment is that the jury's answer to the first special issue submitted in the court's main charge is contrary to the evidence, in that the evidence fails to show that plaintiffs were under duress at the time they executed the contract of January 5, 1914, and that the evidence upon that issue is insufficient to support the finding. Five propositions are submitted under this assignment, by which it is insisted that the evidence fails to show duress in the execution of the contract of January 5, 1914; that in order in constitute duress of property the evidence must show that the alleged aggressive party made an illegal threat relative to some property right and involving an illegal deprivation thereof —that he made an illegal demand which was acceded to and under such persuasive circumstances as to deprive the complaining party of his free agency in making the contract; that the evidence showed that the alleged threatened act was one which the defendant had the contractual right to perform, and where the preponderance of the evidence shows the justice of his demand, or a strong moral claim thereto, and where the contract made is one resultant from negotiations and deliberations between the parties of several days' duration and based upon compromise and concessions, the transaction is free and voluntary; that in order to constitute duress of property the evidence must show the persuasive circumstances to be such as to break the free agency and destroy the power of withholding assent to the contract, and the condition must be so imminent as that the party yielding must do so without immediate means of preventing the threatened injury; that in order to constitute duress as a defense, or to cancel a contract and recover money so paid, the evidence must show that the contract was executed under pressure of an illegal threat, as virtually takes away the contracting party's free agency. Where the contract, charged to have been made under duress, is shown to have been based upon a valuable consideration, and the complaining parties accept the fruits and benefits thereof, and continue to abide thereby without any tender or offer upon their part to place the opposite party in statu quo, plaintiff should not recover. These contentions are met by appellees with counter propositions, in substance, as follows: That, the parties being partners, the defendant occupied the position of an active trustee toward the plaintiffs and was bound to the exercise of the most perfect good faith towards them; that whenever the parties are not upon an equal footing, and the one has the other at a disadvantage, so that the latter reasonably apprehends material injury to his property or property rights, if he refuses to comply with an unlawful demand of the other, any payment made or contract entered into upon such demand will be deemed involuntary and made under duress, and the payment so made is recoverable and the contract so made is not binding; that it is not necessary, in order to constitute duress of property, to show an illegal threat, or that the will was broken down thereby, but it is sufficient to show that the parties were upon an unequal footing; that one party was in a position to dictate and place the other in position where he had to submit to the demand made by the first or suffer greater losses or inconveniences; that under all the circumstances the jury was authorized to find that the freedom of choice on the part of plaintiffs was overborne by the threats of injury made by the defendant; and that the evidence supports the jury's finding that the contracts of January 5, 1914, and January 14, 1916, are without consideration.

The first assignment requires us to construe the contract. If appellant had the right, under the contract, to discharge D. C. Trigg and assume and perform the duties which the contract imposed upon Trigg, it is clear that in the absence of duress and of the parole agreement he could require appellees to compensate him for his services. The articles of partnership define and limit the rights and duties of the parties with reference to the property and its management in the first, third, fourth, fifth, sixth, seventh, tenth, eleventh, twelfth, and thirteenth paragraphs. Paragraphs numbered first, third, and thirteenth, relate particularly to the issues presented under this assignment. The first paragraph provides that D. C. and S. L. Trigg "are to contribute their work and labor under the direction and supervision of the said party of the first part in the handling of the ranch business of the said Shelton & Trigg, and in taking care of said cattle upon the range, and conducting said business as to the details with their best skill and labor." The third paragraph, by express provisions, excludes them from any voice in the management of the affairs of the partnership or its property and in the exercise of any control over its affairs, either generally or in the details. By the thirteenth paragraph it is provided that in the event of any disagreement with reference to the manner of handling or conducting the ranch, either generally or in detail, the direction and authority of Shelton shall be final and decisive of any such matter in dispute. In addition to the authority given Shelton by the first paragraph to supervise and direct his partners in their work and labor in handling the ranch, taking care of the cattle, and conducting the business as to details, the third paragraph empowers him with greater particularity "to have the sole and exclusive management of the affairs of said partnership and the property and assets, over the other partners," not in lieu of or in their place, expressly prohibiting the lat-

ter from selling any of the property without Shelton's consent. This paragraph extends Shelton's power of control in all matters "to any detail in the actual handling and management of the daily affairs of said ranch and of the cattle upon the same," specifying that such control shall be unlimited and "whenever he desires to exercise said right." To make his powers more explicit it is provided that he may "employ and discharge men upon the ranch," and it is further agreed:

"If at any time either or both of the parties of the second part shall become incapacitated by sickness or otherwise, or refuse to contribute an adequate amount of work and labor under the supervision of said party of the first part for the handling of said ranch business, * * * said party of the first part is to have the right to employ any other man or men to take the place of said parties of the second part, at the expense and liability of said parties of the second part, * * * in accordance with the condition creating the necessity for such substitution."

Paragraphs numbered fourth and fifth, extending these powers of management and control to Shelton in the event of the death of either or both of the partners, and Shelton's administrator, executor, or representative in the event of his death, manifestly have no application. The sixth paragraph simply makes a specific application of the discretionary power granted to Shelton in the first and third paragraphs. The effect of the seventh paragraph is to give Shelton the right to wind up the affairs of the partnership and to deny his partners the right to dissolve without his consent. The tenth gives him the exclusive right to select a bookkeeper. The eleventh gives him the right to sell any cattle and purchase others in their place, and by the twelfth he is given the sole right to pay the debts of the partnership and of his partners and, in the event of dissolution to distribute the net proceeds.

[1] It will be seen by inspection of the above-designated paragraphs that the rights of the Triggs are limited to work and labor under the direction and supervision of Shelton, and they are denied the exercise of any discretion in their work contrary to the direction of Shelton. On the other hand, the contract, while conferring unusual authority upon Shelton, limits his connection with the affairs of the partnership to that of control and management over the Triggs, but such authority is extended even to the details of the business. His right to supervise and control his partners is absolute and unlimited, but there is no authority given him anywhere in the contract to discharge either or both of them, or to assume and perform the duties which the contract imposes upon them. The third paragraph provides that should either or both of the Triggs "become

incapacitated by sickness or otherwise, or refuse to contribute the adequate amount of work and labor under the supervision of" Shelton, that the latter may employ other men to do the work, and that such employment is to be at the expense of such partner or partners. It would be doing violence to even this extraordinary provision of the contract to hold that under its terms Shelton had the power to discharge either of his partners because they were not conducting the affairs of the ranch or doing their work in accordance with his ideas, unless such failure was also a wilful refusal to obey his directions. Looking to the contract alone, Shelton had no right to discharge D. C. Trigg, substitute himself, and charge the partnership for performing Trigg's duties. The contract expressly provides that neither of the Triggs shall be entitled to any compensation for performing the duties imposed upon them, and the fact that a substitute under certain circumstances might have been paid a reasonable sum at their expense would not entitle appellant to himself assume their duties and make such charge. He could sell the property, thus dissolving the partnership, but he could not oust his partners unless they became incapacitated from sickness or other cause, or refused to do an adequate amount of work under his supervision.

The term "adequate amount of work" means a sufficient amount and has no reference to the skill and efficiency manifested in its performance, for the contract implies that Shelton should supply the latter and the oral agreement binds him to do so without compensation. Trigg's duties under the contract were ordinary, and they were easily performed, since he was required to simply execute the plans of Shelton and under Shelton's supervision. The contract with greater precision imposes upon Shelton the duty of supervising, controlling, and superintending. None of the conditions existed which authorized Shelton, under the contract, to employ another man or men to take the place of either of the Triggs, and, if they had, one could doubtlessly have been employed to do the work of that kind for much less than $7,500 per annum. So we conclude that he transcended his powers and violated the plain provisions of the contract when he deposed S. L. Trigg as ranch boss and discharged D. C. Trigg and assumed their duties. He could not wrongfully create a condition which required extra effort on his part and legally demand that they pay him for performing services assigned to them by the written contract. If the Triggs refused to do their work according to his orders he could employ other parties to do it at their expense, or, at his option, dissolve the partnership by disposing of its assets and winding up its affairs. This was the limit of his

authority in this particular. The contract does not provide that Shelton could appoint substitutes if the Triggs should prove to be incapacitated, but the language is if they "shall become incapacitated by sickness or otherwise." The reasonable inference from this language is that from his previous knowledge of them he was, when he proposed the partnership, satisfied as to their capacity, skill, and ability.

If we interpret the contract in the light of the evidence, our conclusion must be the same. Shelton and D. C. Trigg had been acquainted for about 40 years, and since 1909 Shelton's bank had loaned Trigg money several times. It was Shelton who first proposed that they purchase the property and form a partnership to own it. One reason given by Shelton for discharging D. C. Trigg is that the latter cut a partition fence at a point between the two gates which were about 300 yards apart and turned some graded cattle in with some thoroughbreds; another reason was that he wrote a check by mistake for $4 too much. The principal reason seems to have been that Trigg fed the cattle in the dust and mud around the windmills and in rough and rocky parts of the ranch. Trigg denied his responsibility for the fence being down and the cattle mixed. They both say he changed his method of feeding to accord with Shelton's ideas. In the opinion of Shelton and one other witness, D. C. Trigg "didn't have sense enough to feed a bunch of cattle."

If it be admitted that this estimate of Trigg's intellectual qualifications is correct, the incapacity, under this record, existed when Shelton proposed the partnership, and was one which it was his contractual duty to supply and which the record shows he did supply by instructing Trigg on that point. S. L. Trigg said they did not wheel without Shelton's suggestions and direction. This could not, therefore, be made a ground for ousting him. The oral contract provided that S. L. Trigg was entitled to sustenance for himself and family at the expense of the partnership. The testimony shows that after Shelton had inspected the ranch accounts for some time he objected to some of the items furnished S. L. Trigg and family as "knickknacks," and upon his demand D. C. Trigg, with the approval of S. L. Trigg, paid him $40, that being the amount of the objectionable items, still insisting, however, that S. L. Trigg was entitled to sustenance for himself and family. Later it appears that Shelton refused to permit any of the supplies necessary for S. L. Trigg and his family to be paid for by the partnership. A contract of January 3, 1914, was an original draft of the salary contract, shown to have been made by Trigg's attorney, and the contract of January 5, 1914, supra, was the one finally signed, and, as alleged by Trigg, was made under duress. Appellees' pleadings do not attack the partnership contract, but it is alleged therein that the contract of January 5, 1914, the salary item inserted by Shelton in the dissolution contract, and the check representing the salary and deposited in the bank, are the result of coercion and were executed because of Shelton's threats to sell the property and wind up the business unless these things were done.

[2] As heretofore stated, Shelton unquestionably had the absolute right to dispose of the partnership property and dissolve the partnership at his option, but the question is, Was he justified in enforcing his claim for a salary by threatening to do so? When he threatened to sell the property unless the Triggs agreed to pay him the salary demanded, it was a threat to exercise a contractual right in order to accomplish an illegal purpose, which has the effect of rendering the threat illegal. 1 Black on Rescission and Cancellation, par. 222, says:

"It is also an essential part of the definition of duress that either the means of coercion employed should have been unlawful or the demand to be enforced or the benefit to be gained by the person exerting the pressure should have been illegal in the sense that the law would not, by its ordinary processes, have compelled the coerced party to do what he did."

That one may exercise a legal right in an illegal manner, or to accomplish an illegal end, was considered by this court in Palatine Insurance Co. v. Griffin, 202 S. W. 1014. We think the instant case is another illustration. If Shelton could not sell the partnership property to pay himself a salary in violation of law and the express terms of the contract, he could not accomplish that end by his threat to do so.

In Radich v. Hutchins, 95 U. S. 210, 24 L. Ed. 409, the Supreme Court of the United States says that duress is the threatened exercise of power possessed over a person or his property, from which there is no other means of immediate relief than by payment. In 1 Rowley's Modern Law of Partnership, it is said:

"There can be no question but that the law holds each member of a partnership to the highest degree of good faith in his dealings with reference to any matter which concerns the business of the common engagement, and that each partner, being the agent of the firm, must be held, during the existence of the relation, to the same accountability as other trustees in all matters which affect the common interest. There is no stronger fiduciary relation known to the law than that of a co-partnership where one man's property and property rights are subject to a large extent to the control and administration of another."

See, also, 5 Elliott, Contr. pars. 4905, 4906, 4952, note.

The rule here announced applies with peculiar force under the facts of this case, be-

cause of the unusual stipulations contained in the articles of partnership, which have the effect of repealing much of the law of partnership relating to the rights of partners' inter se. Shelton reserves to himself the right to dissolve the relation at will, but as to the Triggs the partnership is for five years, unless he consents to end it earlier. All of the work to be done by the Triggs, even as to details, must be done under his direction and supervision. They are not to sell any cattle or other personal property without his consent. He has the sole and unlimited control even as to the daily affairs of the business. They are denied the right to employ or discharge men and even to name a substitute in the event of their illness, inability, or unwillingness to work. He is the custodian and dispenser of all the funds; the buyer, seller, and holder of all the property. He alone can employ a bookkeeper, and in the event of the disagreement upon any matter the thirteenth clause would make him the final arbiter and court of last resort, from whose decision, according to the contract, there is no appeal, and his jurisdiction extends to even the slightest detail of the business. It is said in Adams v. Schiffer, 11 Colo. 30, 17 Pac. 29, 7 Am. St. Rep. 207:

"Contracts made and money paid under duress of goods have been held, the former void and the latter recoverable, in many well-considered cases both in England and America. The decisions are not uniform in their expression of the law, but they all rest upon the proposition that the duress of property was such as to render the contract or payment involuntary. It seems to be well settled that where a party has possession or control of the property of another, and refuses to surrender it to the control and use of the owner, except upon compliance with an unlawful demand, a contract made or money paid by the owner under such circumstances, to emancipate the property, is to be regarded as made under compulsion."

It is clear that under such a contract as this the parties were not dealing at arm's length in regard to the salary and sustenance items. It is said in 13 C. J. par. 322:

"Where the parties are not at arm's length, but one of them is in a position to dictate, courts will treat agreements which are influenced by threats of injury to or the withholding of property as made under duress, as * * * where one with the necessary power threatens to prevent the clearance of a vessel. * * * An order of a military commander in time of war after martial law has been declared, requiring an act to be performed by a citizen which is contrary to his inclination, constitutes duress, although no threats or administrations of violence are used at the time the act is performed," citing Olivari v. Menger, 39 Tex. 76.

In 3 Elliott, Contr. par. 1871, p. 18, it is said:

"A provision in a mining contract that the owner of a mine might terminate the contract if satisfied that the system adopted was prejudicial to the mine, has been held not to give such owner the right to terminate it arbitrarily, and a provision allowing a contract to be canceled for any good cause on 60 days' notice has been held to mean any cause assigned in good faith."

D. C. Trigg testified:

"I thought if I refused to sign this contract of January 5, 1914, Mr. Shelton would close out the business and sacrifice the property. I would not have signed the contract but for that. At that time he was claiming the right to do so under the partnership contract and he was in actual control at that time. I presume that the chattel mortgage he held on our property had a power of sale."

With reference to the dissolution contract he said:

"If I didn't agree to this dissolution I believed that he would close me out and take everything I had as far as would go to pay the debts, and this would ruin my business."

S. L. Trigg testified:

"He (Shelton) told me that I had nothing further to do with the range; I would not give no orders. I had no authority to give this wagon boss orders; in other words, I was through. That I could go to the wagon and stay around it if I wanted to do so, but so far as having any authority or handling that range, why nothing doing. * * * I remained on the ranch and worked and looked after the affairs as best I could from the time Mr. Shelton instructed me that I had no further business there in the way of ranch boss. In the month of April there were cattle at the various camps that I had gathered prior to this time and placed in the feeding pens, and I continued to go over the range and do that. About the time of the contract of dissolution of the partnership, January 1, 1916, I was riding the range at that time and I was on the range in March, 1916. From the date that Mr. Shelton told me I had no further authority as ranch boss I attempted to control some of the employees that were on the ranch. I continued to stay there and exercise what authority I could. * * * Looking over this instrument handed me (contract dated January 5, 1914), I will say I executed it. I signed that instrument because I was afraid not to sign it. Mr. Shelton demanded a salary. I was at the ranch, I guess, when this matter came up between my father and Mr. Shelton. My father wired me to come down to Amarillo and I came. He told me Mr. Shelton demanded a salary and if we didn't pay it he was going to close out the business. I believed that to be a fact. I would not have signed it otherwise."

With reference to the dissolution contract D. C. Trigg said:

"If I didn't agree to this dissolution I believed that he would close me out and take everything I had, as far as it would go, to pay

the debts, and this would ruin my business. I was afraid he would not close it out for its full value. But for that belief, as I have already stated, I would not have signed the salary contract."

Shelton testified with reference to his demand that 1,000 cows be cut out to provide for his salary:

"I told him I would stop dividing. We had already cut and divided part of them but that we would not finish dividing unless he made that cut, or fixed it so I could get my money."

On this question Shelton testified:

"I didn't say I was going to sell them out and sacrifice the property if D. C. Trigg didn't execute that salary contract. I was not going to sacrifice nothing. I had a half interest in it and more than he had too. I had all my money in it; more than he had. * * * I did state something about some prospective purchasers I might have had in view. I told him that I had in view a man or two I might sell to. I had in mind Lee Bivins, of Landergin, or somebody like that, but I never did mention to anybody about selling that outfit out to them or anybody else. I always told him that in case I wanted to I might sell it to somebody and then run it for them, but I was not hunting no job to run any ranch and was not wanting any salary job, and would take none unless it would be under circumstances like these."

The case of Goodhue v. Hawkins, 133 S. W. 288, is one in which a tenant paid the full amount of rent for certain premises upon which there was a barn. The landlord demanded and used the barn. The tenant was held entitled to recover the rent of the barn, which had been taken from her by the lessor under duress, upon the ground that she feared if she refused to make full payment of rent under the contract the lessor would forfeit her lease and oust her from the leased premises. The recovery was based upon the proposition that the parties were not upon equal terms. In the case of Smith v. Houston National Exchange Bank, 202 S. W. 181, the plaintiff had paid a draft drawn for too much, with a bill of lading attached, in order to get possession of property held by a common carrier. He was permitted to recover the excess so paid because, as held by the court, the payment was made under duress of goods. In the case of Caldwell v. Auto Sales & Supply Co., 158 S. W. 1030, the appellant gave a check to pay for repairs to his automobile for a larger amount than was really due. After obtaining possession of the machine he stopped payment of the check, whereupon the appellee filed suit. The Court of Appeals sustained his defense of duress. The facts in the case of Michalke v. Brown, 185 S. W. 429, are that plaintiff had paid one of several notes which had not been surrendered to him. Afterwards suit was instituted upon all of the notes, and by mistake of a party acting for him the first note was paid the second time. The payment was induced by the fact that his funds had been garnished. The court held that such payment was made under duress. The case of Harris v. Cary, 112 Va. 362, 71 S. E. 551, Ann. Cas. 1913A, 1351, is one in which the plaintiff was required to relinquish his interest in certain mineral lands because of an illegal threat made by the dominant party to resort to certain methods which would result in the destruction of plaintiff's interest. The court said:

"The doctrine appears to be well established that where one party has possession or control of the property of another, and refuses to surrender it to the control and use of the owner, except upon compliance with an unlawful demand, a contract made by the owner under such circumstances to emancipate the property is to be regarded as made under compulsion and duress. Nor can it be doubted that a contract, procured by threats inducing fear of the destruction of one's property, may be avoided on the ground of duress, there being nothing in such a case but the form of a contract, wholly lacking the voluntary assent of the party to be bound by it. To constitute duress, it is sufficient if the will be constrained by the unlawful presentation of a choice between comparative evils; as inconvenience and loss by the detention of property, loss of property altogether, or compliance with an unconscionable demand. In civil cases, the rule as to duress has a broader application at the present day than it formerly had. So when concessions are exacted through the necessity of a person, in order to save his property, illegally withheld by another, from destruction or irreparable injury, such a transaction may be avoided on the ground of compulsion, though not amounting to technical duress. [Citing authorities.] * * * In Harmony v. Bingham, 12 N. Y. 99–117, 62 Am. Dec. 142, cited by Mr. Justice Brewer in 148 U. S. 581, 37 L. Ed. 569, 13 Sup. Ct. 684, supra, it is said: 'If a party has in his possession goods or other property belonging to another, and refuses to deliver such property to that other unless the latter pays him a sum of money which he has no right to receive, and the latter, in order to obtain possession of his property, pays that sum, the money so paid is a payment by compulsion.' In the case at bar, the allegations of the bill, which are admitted to be true by the demurrer, state a case clearly calling for interposition of a court of equity to afford relief. The helpless situation and the extreme necessities of the complainant were taken advantage of to compel him to surrender to the defendant one-fourth of his property, which was under the latter's control, and to which, as alleged, he had no lawful right, in order to save such property from sacrifice; the choice offered the complainant being financial ruin or immediate compliance with the alleged fraudulent, oppressive, and unconscionable demands of the defendant. It is clear, both upon reason and authority, that the bill states a good cause of action, entitling the complainant to relief, if the facts alleged are established by the evidence to be adduced."

We quote this language from 1 Elliott on Contracts, par. 144:

"Originally the common-law rule relative to duress was narrow. By it duress meant only duress of the person, and even in that instance nothing short of duress amounting to a reasonable apprehension of imminent danger to life, limb, or liberty was sufficient to avoid a contractor to enable a party to recover money paid. Courts of equity would, however, set aside, when there was an imposition upon a servient party of such character as to overcome his free agency, and gradually the courts extended the doctrine so as to recognize duress of property as a moral ·duress which might, equally with duress of person, constitute a defense to a contract induced thereby, and that duress of property would entitle one to recover money paid under its influence."

Appellant, quoting from Hahl v. Hutcheson, 196 S. W. 266, insists upon the rule there quoted from 30 Cyc. 1303, that—

"In order to recover money paid under duress, it must be shown not only that there was duress, but also that it was against equity and good conscience for the payee to retain the money."

[3] The general rule of law is that neither partner is entitled to any compensation for his services rendered the firm. 1 Rowley, Modern Law of Partnership, par. 350, and the contract expressly so provides. The same rule obtains even where the services are unequal. Id., par. 351. To hold that Shelton is entitled in equity and good conscience to retain the $7,500 is tantamount to saying that one may violate the law and breach his contract by ousting his partner, who was working without compensation, assume and perform his partner's duties, contrary to the provisions of the contract and over the latter's protest, and retain the salary so illegally obtained. This would be permitting him to profit by his own wrong. We deem it unnecessary to prolong this opinion by further quotations from the decisions, but think our position is sustained by the great weight of authority. Mo., etc., Railroad Co. v. Pacheco, 185 S. W. 1051; Chicago, etc., Ry. Co. v. Chicago, etc., Coal Co., 79 Ill. 121; N. O., etc., Ry. Co. v. La. C. Co., 109 La. 13, 33 South. 51, 94 Am. St. Rep. 395; Leigh, etc., v. Brown, 100 Pa. 388; Guetzkow Bros. v. Breese, 96 Wis. 591, 72 N. W. 45, 65 Am. St. Rep. 83; Swift & Co. v. U. S., 111 U. S. 29, 4 Sup. Ct. 244, 28 L. Ed. 343; Snyder v. Rosenbaum, 215 U. S. 261, 30 Sup. Ct. 73, 54 L. Ed. 189; Kilpatrick v. Germania Life Ins. Co., 183 N. Y. 163, 75 N. E. 1124, 2 L. R. A. (N. S.) 574, and note, 111 Am. St. Rep. 722.

[4] The test seems to be now, not so much the nature of the threat or the words used, but the decision turns on the effect of the threat upon the mind of the servient party. It is the duty of the court to take into consideration the standard of the individual affected and all the surrounding circumstances of the transaction, and when it appears that the agreement was under restraint, that the parties were not dealing at arm's length, but that its execution is the result of a choice between two evils, a court of equity will refuse to enforce the contract, or, if payment has been made, decree a recovery of the sum so paid. The contract of January 5, 1914, expressly provided that it should not in any wise alter or modify the partnership agreement of July 31, 1912, except as therein expressly stated, and should be construed in connection with the partnership agreement, thus extending the dominion given Shelton originally by the articles of partnership. A similar provision is inserted in the dissolution contract, and Shelton's demand that the 1,000 cows be omitted in the division of the cattle, to secure his salary, or that the check be deposited in the bank for that purpose, and his statement that he would not proceed with the dissolution and partition of the property, is sufficient to sustain the jury's findings that the duress continued until after the dissolution was effected.

[5-7] The jury further found that the Triggs were not estopped by any of the facts alleged and shown by appellant to insist upon duress either as to the salary claim or the sustenance claim for S. L. Trigg and family. So long as the conditions existed which enabled Shelton to coerce them by the threatened sale of their property, any acts of the Triggs under such pressure cannot be charged as an estoppel. We think the jury properly found that there was no consideration for either the salary contract or the dissolution contract. They did not willingly accept the self-imposed services of Shelton, and, even if we admit that the success of the enterprise was due to his efficiency under the circumstances, they cannot be considered as a consideration for the salary which he demanded. A contract obtained under duress cannot be ratified by the servient party unless the so-called ratification is after all pressure and coercion have been removed. The facts show that the Triggs never consented to being deposed and ousted; that they objected to the employment of Exum, and even when the check representing the salary was deposited D. C. Trigg said:

"I told him that I would show him before this thing was over, as I don't intend that this shall be taken away from me in this kind of style, but in order to get this business (dissolution and partition) on I am going to turn over the check and it will be paid and I expect to get it back."

He further testified that they never did get a final settlement, as provided for in the dissolution agreement.

[8] Under the third assignment it is in-

sisted that because the proof does not show the threat to have been in the words alleged in the pleading a judgment entered finding duress is fundamental error. Appellant urged no exceptions whatever to the petition, nor was any objection made upon the ground of variance. Moreover, the petition several times alleges duress of property in general terms. In the absence of an exception or an objection to the evidence the proof adduced was clearly admissible.

[9-11] The fourth assignment is based upon the court's refusal to direct a verdict in appellant's favor upon the issue of the salary. There are eight different propositions urged under this assignment. What has heretofore been said disposes of all the contentions urged in these propositions, except, possibly, those insisting that the consideration for the salary was the service rendered by Shelton and his agreement to waive the payment of the salary for the full time and his further consent to the dissolution of the partnership. The Triggs could not be made to pay the salary of a substitute appointed and acting over their protest until the conditions existed which made the appointment of such substitute proper. The services of a substitute wrongfully appointed are not a consideration for a promise made under duress to pay it. Their voluntary consent is a necessary element, without which there can be no contract, and because the services were thrust upon them they cannot be held liable upon an implied contract; nor can Shelton's consent to a dissolution before the end of five years be held to be a consideration for the salary stipulation in the dissolution contract, or for the deposit of the salary check, for the fundamental reason stated by the United States Supreme Court as follows:

"It is, however, not to be doubted that there is a clear distinction sometimes between the motive that may induce to entering into a contract and the consideration of the contract. Nothing is consideration that is not regarded as such by both parties. It is the price voluntarily paid for a promisor's undertaking. An expectation of results often leads to the formation of a contract, but neither the expectation nor the result is 'the cause of meritorious occasion requiring a mutual recompense in fact or in law.' Dyer, 306b. Surely a creditor may do a favor to his debtor, or may enter into a new and independent contract with him, induced by which the debtor may assent to giving a note for the previously existing indebtedness. Without the favor or the new contract there is in such a case a full consideration for the note and the parties may not have contemplated that the favor or the new contract was to be paid for. To regard them as entering into the consideration of the note would be to make a contract for the parties to which their minds never assented." Philpot v. Gruninger, 14 Wall. 570, 20 L. Ed. 743.

No consideration is expressed in the dissolution contract other than the desire of all parties and mutual promises to dissolve and divide the property. It is clear from the record that none of the parties regarded Shelton's agreement to dissolve as a consideration for the Triggs' promise to pay the salary item inserted in the dissolution contract. The fact that D. C. Trigg protested to the last when the check was deposited and followed up his protest by this suit to recover it shows that the salary was not to be "the price voluntarily paid for the promisor's undertaking" to dissolve. Shelton expected to receive the amount of the salary upon dissolution, and that was, no doubt, his motive for agreeing to dissolve at that time. If his services entitled him to the salary, "then in such case a full consideration" had been paid before he granted the favor, and "without the favor or the new contract," and in such case "neither the expectation nor the result is 'the cause or meritorious occasion requiring a mutual recompense in fact or in law.'" Levy & Cohn Mule Co. v. Kauffman, 114 Fed. 174, 52 C. C. A. 130.

"The mere presence of some incident to a contract which might, under certain circumstances, be upheld as a consideration for a promise, does not necessarily make it the consideration for the promise in that contract. To give it that effect it must have been offered by one party and accepted by the other as one element of the contract. * * * 'Consideration, like every other part of a contract, must be the result of agreement.'" Fire Insurance Association v. Wickham, 141 U. S. 564, 12 Sup. Ct. 84, 35 L. Ed. 860.

D. C. Trigg testified:

"With reference to these two instruments (dissolution and partition agreements), I had been trying since 1914 to get Mr. Shelton to agree to a division of the property and a dissolution of the partnership. He would not divide at all; he was going to run it out the full time. In endeavoring to obtain a division and dissolution I said, with reference to our indebtedness to him, that I was ready to pay him every dollar I owed him and settle up and divide the property. I don't think there was ever a time mentioned dissatisfaction coming up but what he referred to his authority to do these things. As to what parts of the two contracts of January, 1916, I objected to, I made objections to that salary and cutting out these cattle. I discussed my objection with Mr. Shelton and he would not omit those provisions at all. He said he would not make a contract of dissolution without those provisions—would close out the business first. If I didn't agree to this dissolution I believed that he would close me out and take everything I had, as far as it would go, to pay the debts, which would ruin my business. We actually paid Shelton every dollar that we owed him in January, 1916—January 5th, or somewhere along there. So far as indebtedness is concerned, we were clear of Mr. Shelton, and so far as the Capitol syndicate was concerned, we were clear of them. Every dollar had been paid. We paid Shelton and the syndicate every dollar before

                              (226 S.W.)

these dissolution contracts of January, 1916, were entered into. As to how Shelton was going to ruin us at that time he could still sell the outfit. He had it under his control; he would not give it up and wanted to do it. He refused to turn it over to me. I didn't have a half interest in the cattle. The Security National Bank had it, I had a half interest in the cattle, but they were all turned over to the Security National Bank. They had a mortgage on it and I could not go out and sell a half. As to Shelton not having any control over the Security National Bank, he did over the cattle. I don't know how Shelton could have sacrificed and sold out our interest at that time. He had been, and was then, when we made that 1916 contract, just bearing down on us to beat the band, and we were under terrible pressure. I was afraid of him so far as our interest in the property was concerned. I first sprung the question of dissolution and had been thinking about it for quite a little while, about when I got him paid down to this one note and he was making it so unpleasant and so mean for us, I determined that I was going to get away from at all hazards, and I went to Dallas and got a contract for the money at the City National Bank. If he took that course (to sell out the business and wind it up) I thought I would sustain a heavy loss. If it had not been for this apprehension I would not have given the check at all under any circumstances. At the time the partnership contract was made he said he never expected to refer to it unless we were trying to rob him or slough off stuff, and he was putting it (his authority to sell and wind up) there to protect himself and he never expected to refer to it. My fear of his sacrificing our property had something to do with my not mentioning the claims against the property. After the making of this contract in two parts on January 14, 1916, the business continued under the same management until the partition was completed."

S. L. Trigg testified as to the dissolution contract:

"I executed that contract. I was at the ranch at the time this matter was taken up. I got into communication with my father and came to Amarillo and had some discussion with him with reference to it after I arrived. He (Shelton) still wanted his salary, and in this dissolution contract I had some objections that I discussed with my father in regard to the salary part of it. My father stated that he had a conversation with Shelton about this provision. He stated he wanted a salary in it and if we didn't agree to this clause of the contract he would close it out."

The eleventh paragraph of the dissolution contract is:

"After the final division of said partnership property all liabilities against the partnership known to exist shall be paid, and at such time an audit of the books and accounts of the partnership shall be had, and a full settlement of the partnership matters made between the parties hereto at such time."

As heretofore stated, the dissolution contract also continued the dominion and authority in Shelton until final settlement in accordance with the terms of the articles of agreement. The court charged the jury as follows:

"In order to find for the defendant on his plea of estoppel, you must find and believe from a preponderance of the evidence that prior to or at the time such contracts (of January 4, 1916), were executed, the plaintiffs intentionally withheld from defendant their demand for claims arising prior thereto, and intentionally failed to apprise defendant of their purpose, if any, then or later to demand said claim, and that they knew or had reason to believe that the defendant understood said contract did include a settlement of prior claims of plaintiffs upon defendant, and that defendant would not have signed said contracts if any of said claims or demands for such claims had then or theretofore been made by plaintiffs to the defendant. If you so find and believe from a preponderance of the evidence, your verdict will be for the defendant on his plea of estoppel, and you will make your answers to the special issues submitting such defenses accordingly."

As heretofore shown, the jury found against appellant on the salary and subsistence claims.

[12] Several complaints are presented by the fifth assignment; the only one not heretofore considered is that the court erred in refusing to direct a verdict for appellant on the issue of S. L. Trigg's sustenance claim, because the evidence conclusively shows that at the time $40 was paid to appellant by D. C. Trigg for a portion of S. L. Trigg's sustenance there was an agreement between the plaintiffs and defendant that the partnership should no longer pay such account. D. C. Trigg testified:

"As to the discussion we had with Shelton as to the matter of subsistence of the partners in the partnership arrangement, Mr. Shelton and I were to take care of ourselves and Steve was to be taken care of by the partnership. The distinction was made between the subsistence of S. L. Trigg and his wife and myself and Mr. Shelton because Steve had a family up there and neither of us had at that time. I think I know what the general custom is among ranchmen in the Panhandle of Texas with reference to subsistence of a foreman of the ranch who is to have charge of the range work. I think all foremen are taken care of by the ranch, all of the men on it at work; I mean by that that he furnishes the food and living expenses of the foreman and his family, not including clothing and things of that sort, but just articles of food, house rent, and so on—living expenses and things of that kind. During the early part of the partnership the subsistence of S. L. Trigg and his family was paid by the partnership. Mr. Shelton was aware that his (S. L. Trigg's) subsistence bills were paid by the company because he looked over the bills. He made no objection to it until along about the first week in January,

1913. In February he got down and found a few oranges and some cereals and some crackers and one thing and another on the bill, and he said, 'Who got these?' and I said, 'Steve,' 'Well,' he said, 'if Steve and his family can't eat what they eat here (at the ranch headquarters) he will have to pay for it. We are not going to furnish anything except what we all eat. I eat it when I come here and you eat it and if he eats that he will have to pay for it.' It was either in February or March when he got out those bills and I paid him $40 in cash, a check for his half. There was $80 he cut out of it. He claimed that Steve had got in 'knickknacks,' but most of it was for the ranch. We had cereals every morning for breakfast, and they were all cut out—the bulk of them; I didn't agree to it; I protested it right along. He insisted it should be done, and from that time on D. C. Trigg & Son paid Steve's bills. I mean by sustenance, or subsistence, Steve Trigg's living expenses—meat and bread. As to what was contemplated by the original contract in 1912, I presumed to live as economically as we did on the headquarters ranch. What we ate there he expected them to eat over there at Steve's house. Prior to the time of the dissolution and at the time the dissolution contract was made, I never made any statement to Mr. Shelton whatever in regard to this claim of S. L. Trigg for sustenance. I had all of this in mind. I told him there would be a reckoning. I don't think I testified to that the other day. I don't think I went that far with it. When I was up there in 1913 these things that could be picked out that he was objecting to I paid him this difference of this one half. Now as to my telling him in 1913, 'Now see here, John Shelton, there is going to be a reckoning some day about this matter;' he didn't stop it then; he didn't stop feeding Steve. I think such conversation did occur when he stopped. He stopped along about the last of May or the first of April, 1913. I know it was somewhere about five months he was feeding Steve and his family. I think I did make such a statement on the witness stand if I was called upon. I don't know what I did say the other day. From that time up until the date of the settlement I didn't make any claim for settlement to John M. Shelton in regard to this sustenance claim. He finally said he was going to cut him out entirely and that he was not going to feed him and his family, and, 'Don't let anything more be charged to the company for him.' I didn't agree to it. I protested it right along."

Steve Trigg testified:

"In regard to the living expenses of the three partners, they was to take care of me just like the rest of the camp men; was not to feed my father; and Mr. Shelton told me that he would feed me just like the rest of the camp men; that included my family, and I and my folks were to move to the ranch. My family moved to Channing along about the 13th of December, I believe. From that time on to the dissolution of the partnership my family lived at Channing. During the first months after I went there my living expenses were paid by Shelton & Trigg. This continued until about April, 1913. After that time the living expenses of myself and family were paid by D. C. Trigg & Son. I never had any conversation with Mr. Shelton at all myself in regard to this subsistence claim on my account. In regard to this grocery bill, or any other thing in there that I claim occurred prior to January, 1916, there was not any claim made by me in regard to this grocery claim or any other claim that accrued and matured, as we claim now, prior to January, 1916, to Mr. Shelton, outside of the expense account I turned in on my ranch expense account."

Shelton denied that there was any agreement that the firm should pay the living expenses of S. L. Trigg, and said further:

"About February I was up there and was looking over the bills and found a lot of fresh vegetables and a whole lot of things I never had furnished on a ranch and nobody else ever furnished, and I asked D. C. Trigg how some of them came on the bills and he said, 'Steve used them over at the house;' and I told him there was no trade here for this outfit to feed Steve's family, and we finally talked the matter over and he agreed he would pay me for half of those things, and we together picked out a lot of those things, something like $30, running probably a month and a half or two months, and I finally told him if he would take my half of them just let 'it go and drop it, but he would have to stop it; it was not the agreement. He agreed it was not the agreement. He agreed it would stop and it did stop. The understanding between us was that the partnership would furnish the provisions, feed me and S. L. Trigg when we were there, and that I was to feed my family and they would do the same. I always had a line of chuck that I furnished the ranches. There was not anything said at the time the partnership contract was made that I was to furnish S. L. Trigg and his family. I never agreed to furnish his family. I agreed to furnish him and D. C. Trigg and myself and the outfit whenever one of us was on the ranch."

Some of the items objected to on the account are raspberries, asparagus, oranges, canteloupes, pineapple, chocolate, baby food, oysters, pimentoes, dates, apricots, and fresh tomatoes. This testimony fails to show any agreement between appellant and appellees that the partnership should not pay the living expenses of S. L. Trigg at the time D. C. Trigg gave his check for $40, being one half of the items on the account which he termed "knickknacks." Knickknacks are defined to be trifles, toys, jimcracks, and baubles. Other items, such as hairpins, embroidery, lace, mothballs, flower seed, rompers, O-Cedar oil, and braid, appear upon the account, and it may be that these are the items objected to and for which $40 was paid.

The sixth, seventh, eighth, and ninth assignments are repetitions of what has been urged under previous assignments.

The tenth and eleventh assignments are based upon the admission, over appellant's objections, of the evidence of S. L. Trigg and D. C. Trigg with reference to the exe-

(226 S.W.)

cution of and circumstances surrounding the articles of partnership. The tenth assignment is:

"The court erred in admitting in evidence and in overruling defendant's objections to the testimony of S. L. Trigg relative to obligations incurred as assumed by him prior to the execution of the partnership contract of July 31, 1912, and his testimony relative to the reasons actuating him in signing said partnership contract, and the further testimony that said partnership contract was signed after the contract with the Capitol syndicate, in which he had theretofore assumed obligations in amount of $800,000, and that paragraph 14 of said contract was added thereto at the instance of plaintiffs, after the same had been written and completed, and his testimony that he made objections to the defendant as to said partnership contract before signature and as to the attorney who drew the same, and that he was not represented by an attorney, all of which testimony was admitted over the objections of the defendant," etc.

It appears from the bill of exceptions that the witness was permitted to state that Shelton said he wanted to draw a little partnership contract, and in reply to his counsel's question stated that Shelton's attorney had drawn the contract. The bill of exception further recites:

'"Steve L. Trigg was permitted to and did testify as follows: 'I didn't sit in the office of Judge Hendricks during all the time the contract of partnership was being drawn and I don't think my father did. After it was drawn I know that my father objected to it. There was one clause added to it—the clause showing that my father and I had a half interest in it—and it was signed. I don't remember whether it was signed the same afternoon or the next morning. While it was being drawn we were at the office part of the time and perhaps at the hotel a part of the time. I don't remember. We were out on the streets or in the hotel or perhaps in the office a time or two. It was drawn the afternoon of the day that the contract with the syndicate was drawn in the morning. I don't just remember how much time was spent in negotiations before the contract with the syndicate was drawn. The main part of the discussion was that night. They might have been a day or two drawing up the contract in all. Mr. Boyce was attorney for the Capitol Freehold Land & Investment Company; Mr. Shelton, Mr. Boyce, my father, and I went to his office. To the best of my recollection the contract was ready for signatures in the latter part of the morning or early part of the forenoon. After the contract was drawn up and signed some other instruments were signed at that time. As to any notes being made, checks drawn, or anything, we paid that forfeit money, that is, put up the earnest money, to the syndicate people, which was $50,000. Mr. Shelton then said he wanted to draw up a little partnership contract and we agreed to have the contract. Mr. Hendricks drew that. He went to work on it right away. My father and I were in the office part of the time, perhaps, while the contract was being drawn. We were out on the streets or in the hotel, or perhaps in the office a time or two. I didn't sit in the office all the time and I don't think that my father did. I know my father objected to the contract after it was drawn and there was a clause added to the contract showing we had a half interest in it. After that clause was added the contract was signed.' "

The bill of exceptions under the eleventh assignment recites, in part, that while D. C. Trigg was on the witness stand his counsel asked him, "Did you discuss the objectionable features of said contract with Mr. Shelton" (referring to the partnership contract)? This was objected to. The objection was overruled and the witness answered in the affirmative, and further testified as follows:

"My situation at the time I executed the contract of partnership with reference to obligations that I incurred was that I had incurred the obligations to the syndicate and had signed this note and obligation to take over these cattle at that time;" that paragraph 14 of the partnership contract was added thereto at the instance of plaintiffs, after it had been written and completed by counsel representing defendant at the time of his preparation; that he knew the custom among ranchmen in the Panhandle with reference to the subsistence of foremen on the ranch and the subsistence of their families; that as a matter of custom these were paid for by the owner of the ranch; that plaintiffs had no counsel representing them in the preparation of the partnership contract, but it was prepared by counsel representing defendant.

As we have heretofore stated, the appellees did not, by their pleading, attack the articles of partnership in any way.

[13] This testimony is clearly inadmissible upon any issue made by the pleadings. It was, of course, introduced to strengthen appellees' position upon the issue of duress as tending to show oppressive and unfair conduct on the part of Shelton in holding back the partnership contract until appellees were bound upon the contract made with the syndicate. As said in Wetzel v. Robinson, 138 S. W. 414:

"And under the rule well established by the authorities in this respect, unless it could be said, and we do not believe it could be so said here, that it had no effect on the minds of the jury in reaching a verdict, it constitutes reversible error. * * * The very fact that the proof was offered and insisted upon would indicate that it was regarded by counsel as material and effective evidence before the jury."

That it was so cannot be doubted. The partnership is denounced in appellees' brief as "the most one-sided and humiliating instrument that white men were ever called upon to subscribe," as well as in other terms equally as fervid and glowing. The facts proven gave appellees a most effective weapon with which to attack appellant and his cause,

and a blade so trenchant in the hands of skillful counsel unquestionably contributed largely to their success upon this issue in presenting it to the jury. The evidence upon the issue of duress, as it affected the case at its various stages, was sharply conflicting, and facts wholly immaterial and irrelevant, and withal so potent, could not be ignored by the jury in deciding it. The court did not cure the error by his charge, and we are impelled to conclude that it was extremely prejudicial. Pennington v. Thomas Bros. Lumber Co., 122 S. W. 923; De Garcia v. Cherokee Life Insurance Co., 180 S. W. 153; McCall v. Atchley (Mo. App.) 194 S. W. 714; Bartlesville Zinc Co. v. Campagnia Minera Ygnacio Ramos, S. A., 202 S. W. 1048.

[14] By the twelfth assignment appellant complains that the court erred in refusing a special instruction to the jury that, even though the jury believed from the evidence that there were disagreements between the parties prior to January 14, 1916, regarding the conduct of the affairs of the partnership, in order for the Triggs to legally demand dissolution on such ground the disagreement must have been such between the parties as that the continuance of the partnership would be unprofitable. There was no error committed by the court in refusing this charge. The terms of the contract foreclose the right of the Triggs to demand a dissolution. This prerogative is vested alone in Shelton by paragraphs numbered 6, 7, and 10 of the contract itself.

Because of the tenth and eleventh assignments of error, which are sustained, the judgment will be reversed and the cause remanded.

HUFF, C. J. I concur in the reversal of this case on the grounds stated by the majority. Clearly, I think the appellees were not entitled to show that they were induced to sign the original contract of partnership because of mistake or ignorance of its provision and of representations as to its effect without attacking it for fraud, accident, or mistake. The acceptance of the contract and acting under it for four years and until the partition of the property accumulated thereunder conclusively estopped the appellees at this late day from assailing it. Our Supreme Court has adopted the following rule, where it is said and quoted as follows:

"In Fox v. Windes, cited above [127 Mo. 502], Justice Sherwood quoted approvingly from Herman on Estoppel and Res Adjudicata, as follows: 'The doctrine of election is founded upon the principle that there is an implied condition that he who accepted a benefit under an instrument must adopt the whole of it, conforming with all of its provisions, and renouncing every right inconsistent with them. The principle is recognized and established in this country almost precisely the same as in England, and rests upon the equitable ground that no man can be permitted to claim inconsistent rights with regard to the same subject, and that any one who claims an interest under an instrument is bound to give full effect to that instrument as far as he can. A person cannot accept and reject the same instrument, or, having availed himself of it as to part, defeat its provisions in any other part; and this applies to deeds, wills, and all other instruments whatsoever." Doty v. Barnard, 92 Tex. 104, 47 S. W. 712.

I think this rule applies to the partnership contract as well as to the other instruments discussed in this case. However, I may say that I have reached the conclusion that in reversing this case it should be remanded for trial on the item designated "salary contract." No other item, except the maintenance account, is attacked, either by assignment, proposition, or cross-assignment. This case offers a proper instance for the application of rule 62a (149 S. W. x). The issues brought up are severable from the other issues of which no complaint is made.

I am unable to concur in the views of the majority on the salary contract. It is my opinion that assignment No. 4 should be sustained; that is, that the trial court should have instructed a verdict for Shelton on the item of $10,312.50. The question here is: Was there in fact a binding salary contract made on January 5, 1914, or thereafter ratified? If there was, Shelton was entitled to the salary contracted and paid him, and the Triggs cannot recover it in an accounting. This contract is assailed on two grounds; that is, that it was without consideration and made under duress of property.

First, as to the consideration, D. C. Trigg testified:

"Shelton was to finance the business and supervise in a way and Steve was to be range man and I was to take charge of the farm and that end of the business; pay off the men and look after the supplies and take care of the cattle down at that end and look after the farm. I was to be down at headquarters and have direction of these general matters and Steve was to have the outside work of looking after the wagon men, taking care of the cattle on the north end, and all the matters pertaining to the ranch. You know the big end of the ranch was north of Channing and by Dalhart and Perico, and also at that time we owned about 118,000 acres out here next to the Mexico line."

By the first clause of the original articles of the partnership the Triggs, father and son, were to contribute their work and labor, under the supervision of Shelton, in taking care of the cattle and horses and conducting the business as to details without charge for such services. As consideration for the contract of January 5, 1914, it is recited therein that—

D. C. Trigg "shall be relieved from the obligation to contribute all his time and labor

to the handling of the business; and the duties of the management and supervision of said business will require much more time and attention of the said J. M. Shelton than was originally contemplated by the parties to said contract."

D. C. Trigg was therefore released from his part contained in the first paragraph of the partnership contract, and also released from liability to pay for his substitute, as provided in the third paragraph. Mr. D. C. Trigg testified:

"From January 5, 1914, the time of signing the contract, on down to the dissolution contract, Mr. Shelton continued in possession of the partnership property and controlled the partnership affairs. I hadn't anything to do with it. Occasionally I would go up there to make some deals."

He also testified:

In negotiating the partnership agreement, Shelton said "he wanted Steve to take one end of it and me the other, and he would finance the business. So far as the active management was concerned, he wanted me to take charge of Channing headquarters."

Again:

"I know that the reason that Mr. Shelton wanted me in connection with the business was to relieve him of the active management of that ranch. He didn't want to do any work. He wanted to finance the business and take that side of it and we were to do the work. Steve was to run the outside of it and I was to run the farm and headquarters at Channing."

The other two partners, Shelton and Steve Trigg, corroborated the above in their testimony. The facts are uncontroverted that after the 1st of January, 1914, D. C. Trigg did not stay on the ranch and contribute his labor and skill, but that Shelton took his place in that particular and did the work. D. C. Trigg and Steve Trigg composed a copartnership, under the name of Trigg & Son, and before the partnership agreement with Shelton and during its pendency they owned and operated a ranch in Carson county, and perhaps some other business, under the firm name of Trigg & Son.

A partnership can only be formed upon agreement, either expressed or implied. A consideration is required for the contract. This element may be supplied by the mutual promises of the respective parties, or their contribution of either money, labor, or skill towards the partnership business. This is universally recognized as a sufficient consideration. A partnership contract may be changed by agreement between the partners, but this, too, must be supported by a consideration. The same character of consideration will support the contract changing the original articles of copartnership. To my mind the facts show there was abundant

consideration for the contract of January 5, 1914. D. C. Trigg was released from his obligation to contribute his work and labor in handling the business and caring for the cattle on the ranch, and to relieve him of a charge for a substitute in case he did not furnish an adequate amount of work or labor. In addition to Shelton's other duties under the original contract, he assumed D. C. Trigg's duties. He had advanced $250,000 on the purchase of the business. The original contract evidences, as well as the testimony, that he would be called on to exercise his business judgment or skill in that line of business. It was not contemplated that he go onto the ranch and become an active participant in the daily work or management in the handling of the multitudinous things on a ranch of that kind. But this he did, under the contract of 1914, for more than two years, under the agreement that the partnership should pay him a stipulated sum. D. C. Trigg's work and labor on the ranch was dispensed with by agreement and he could devote it to the service of Trigg & Son, if he so desired, without being charged for a substitute.

Mutual and simultaneous provisions constitute a valuable consideration, each party being both promisor and promisee. When the party promising is to sustain some benefit, or the party to whom the promise is made is to sustain some detriment, in either or both cases, the contract has a valuable consideration to support it. James v. Fulcrod, 5 Tex. 512, 55 Am. Dec. 743; Lane v. Scott, 57 Tex. 367; Flanders v. Wood, 83 Tex. 277, 18 S. W. 572; Kilgore Lumber Co. v. Thomas, 98 Ark. 219, 135 S. W. 858; Hanson v. Wittenberg, 205 Mass. 319, 91 N. E. 383; McCreery v. Day, 119 N. Y. 1, 23 N. E. 198, 6 L. R. A. 503, 16 Am. St. Rep. 793. It may be true, in the absence of an agreement for compensation, a partner cannot recover for his services. The original contract stipulated that the Triggs should, without compensation, contribute their work and labor. Shelton was to have general supervision, and for such no provision was made for payment. If the compensation was simply to pay for the services to be rendered by Shelton, provided for in the original contract, there would have been no consideration for the contract of 1914. But such is not the fact, as evidenced by both contracts and the undisputed testimony. In the absence of a contract, if Shelton performed, not only the duties imposed on him by the contract, but also those of his partners, with their consent, I see no just reason why an implied agreement to pay for such services may not arise. In discussing this question our Supreme Court, while conceding the general rule that one partner is not entitled to compensation for services in the absence of an agreement, said:

"It only embraced the purchase and running of a farm; and if one partner in such case should, at the instance of the other, devote his time and attention to the farm, while the other was devoting his attention to his individual business, we have no doubt but that the law would imply a promise that the former should have compensation for his services." Hooker v. Williamson, 60 Tex. 524.

Certainly the right is stronger where the partners enter into an agreement to that effect and act upon it for more than two years. The fact that Exum was placed in D. C. Trigg's place in June, 1913, does not affect the consideration of the contract of 1914; neither does the fact that Shelton may have misinterpreted his powers given by the contract to substitute Exum in place of Trigg. In that particular the jury found Exum's salary was not properly charged and Shelton should not be allowed a credit therefor. There is no assignment on that finding or item. Those facts, therefore, do not affect the consideration or agreement of 1914, in my judgment, further than they may bear on the question of duress. The question was, as I conceive it, Was there duress in the making of the contract, and, if so at that time, was it afterwards ratified without duress influencing its ratification? I am willing to concur in the holding that at the time of the execution of the salary contract of January 5, 1914, the evidence was sufficient to submit the issue of duress at that time, while I have grave doubts as to its sufficiency to support the verdict. Under the original contract Shelton had the power to wind up the partnership and sell the effects of the partnership without the consent of the Triggs. At that time the partnership was indebted to the syndicate in the sum of $300,-000 or $400,000. The Triggs were also indebted to Shelton in the sum of $125,000, and there were other circumstances that may have created a reasonable apprehension in the minds of the appellees that if Shelton should then exercise his power, as threatened, under the partnership contract, their interest in the partnership would be dissipated in paying those debts, and that under such fear they agreed to pay a salary. If this is true, it did not render the contract void; until repudiated or rescinded, it would be binding. It was merely voidable. In this situation the appellees permitted Shelton for more than two years to continue under the salary contract until he had paid off the indebtedness due the syndicate, over $500,000, and until appellees' indebtedness had all been paid Shelton he had no lien or power over them or their interest further than was provided in the original partnership agreement. In about four years, under the management of Shelton, and through his labor and skill, in place of D. C. Trigg's, the then net profits of the concern were over

$1,000,000,.and, as admitted by Steve Trigg, their interest was over $600,000 net if a dissolution and division was then had. In January, 1916, the appellees sought of Shelton a dissolution and partition, and there were several things necessary to be provided for. The lease by them of the 600,000 acres of land had to be taken care of for the balance of the term, as well as the interest of their sublessees and the things to which the syndicate had obligated the partners jointly. Some agreement for partition was manifestly necessary before a partition could be had. The cattle had to be divided as well as the land, and all personal property. The expenses in making the partition, etc., had to be cared for. In the midwinter, doubtless, it would have been difficult, if not impossible, to make partition. It is evident, therefore, the appellees approached Shelton in order to obtain dissolution and partition contract and not for immediate partition. The record shows that Shelton was not then willing to enter into such agreement. It was the Triggs who insisted upon it. They say that ever since 1914 they wanted a dissolution and had the money, or could have arranged to pay their part of the indebtedness. At any rate, negotiations for partition were entered into when the salary contract was reached and arrangements for its payment discussed. The Triggs were unwilling to have it paid out of the partnership funds. Shelton insisted upon the payment under the contract. Without quoting extensively from the evidence, the record warrants the statement that since 1914, as stated by D. C. Trigg, he had been trying to induce Shelton to agree to a division of the property and a dissolution. Shelton would not agree to it, but insisted on running the full time. D. C. Trigg says he objected to those parts of the two contracts of January, 1916, as to dissolution and partition. With reference to the salary and cutting out certain cattle, he says:

"I discussed my objection with Mr. Shelton and he would not omit those provisions at all. He said he would not make a contract of dissolution without those provisions—would close out the business first. If I did not agree to this dissolution I believed he would close me out and take everything I had, as far as it would go, to pay the debts, which would ruin my business."

The witness further stated:

"We paid Shelton and the Capitol syndicate every dollar before these dissolution contracts of January, 1916, were entered into."

He further states:

That Shelton could ruin them by selling out the business; had it under his control and would not give it up, and wanted to do it and refused to turn it over to him, and, in fact, that a bank had a mortgage on the cattle

executed by the appellees, and that he (Trigg) could not sell a hoof. Shelton had control over the cattle if he did not over the bank. He did not know how Shelton could have sacrificed and sold out their interest at that time. "He had been and was then, when we made that 1916 contract just bearing down on us to beat the band, and we were under terrible pressure of duress. I was afraid of him so far as our interest in the property was concerned."

The second clause of the dissolution contract is as follows:

"Subject to the provisions of this contract, said partnership heretofore existing between the said parties shall cease and determine upon the completion of the division of the partnership property, on or about the 1st day of December, 1916, provided that it is expressly agreed and understood that if this dissolution is carried into effect the salary to be paid to the said John M. Shelton under the terms of the contract of January 1, 1914, shall cease from and after the 1st day of October, 1916; but it is expressly agreed and understood that he shall have the right to pay himself such salary from the 1st day of January, 1914, to said date, out of the partnership funds, as assets in his hands at the time of the final dissolution. Nothing herein contained shall affect the right of the said John M. Shelton with reference to winding up the affairs of the partnership as contained in said partnership agreement, except as such provisions may be inconsistent with express provisions of this contract or the contract with reference to the manner of partition of such property."

And the following provision of the partition contract, as part of the dissolution contract, is as follows:

"The three and four year old steers at the north camp and about 1,000 head of oldest cows, which shall be cut out and held separately as the work proceeds, will not be divided until all the other cattle are divided, it being contemplated that they probably will be sold at or prior to the division of said cattle and the funds will be for division instead of the cattle; but if said steers are not previously sold upon completion of the partition of the other cattle, they shall be rounded up and divided in the same manner as the other cattle. In the event the cows have not been sold, and there is not in hand of the partnership funds sufficient to pay off and discharge all partnership liabilities at the time, said 1,000 head of cows, or so much thereof as may be necessary, shall be sold and the proceeds shall go into the partnership fund; but if there should be on hand at such time funds sufficient to pay off and discharge all partnership liabilities, then said 1,000 head of cows shall be divided as the other cattle."

It appears while the cattle were being divided the appellees wanted to divide the cows and steers mentioned in the paragraph quoted from the partition contract. Shelton insisted they should be cut out and held for sale under that provision. Appellees insisted that they were able to pay for their part

of any indebtedness due or liabilities by the partnership. Shelton insisted that he must be paid before the cows, etc., were divided or he would then stop the partition. It appears that Trigg went to the First National Bank and through its president made arrangement for the payment. He states he put up his check to hold until November 1, and that he did so under the strictest protest. Shelton asked what he meant and Trigg told him he did not intend this should be taken away from him in this style, but in order to get this business on he was going to turn the check over and it would be paid and that he (Trigg) expected to get it back. I believe this is the substance of the material facts on this issue. This substance of the above is repeated over and over in a voluminous record, in varying form perhaps. It will be seen by the sixth and seventh clause in the original contract of partnership that Shelton had the right to wind up the affairs of the partnership, sell the property, pay off the debts, retain any amount due him by either of the partners, and divide the proceeds between the partners. The right to wind up the affairs by Shelton took precedence and priority over an attempted dissolution made by appellees, and the twelfth clause gave Shelton the right to distribute the net proceeds to the appellees after dissolution. It will not, I presume, be asserted that the contract of dissolution and partition in 1916 was not an express ratification of the contract of January 5, 1914, in the absence of then existing duress, even if the acceptance of Shelton's services to the partnership for two years was not. These contracts, I think, expressly ratified the salary contract and the services rendered thereunder. If there was coercion inducing the appellees to make these contracts so as to make them not their agreements or contracts, the ratification may be defeated for duress. There is considerable divergence in the views as expressed by the courts as to what constitutes duress. A recent author on contracts suggests the law on that subject is still in a transitory stage. It seems to be held by the courts, if circumstances of great hardship exist, a promise to obtain property unlawfully detained may be avoided for duress. If no circumstances of special hardship existed, a wrongful seizure or detention of property may be such detention of property as to constitute duress and invalidate a contract induced thereby; but, if a party alleged to have exercised duress has only done what he had a legal right to do, duress cannot exist.

"By many, if not most, of the modern authorities, however, the true doctrine of duress is held to be that a contract obtained by so oppressing a person by threats regarding the safety or liberty of himself or of his property * * * as to deprive him of the free exercise of his will and prevent the meeting of minds necessary to a valid contract, may be avoided

on the ground of duress, whether the oppression causing the incompetence to contract be produced by what was formerly deemed duress and relievable at law, as such, or wrongful compulsion, remediable only by an appeal to a court of equity. According to this view, what constitutes duress is a matter of law." 9 R. C. L. Duress, § 7, p. 716.

"It is never duress to threaten to do that which a party has a legal right to do, and the fact that a threat was made of a resort to legal proceedings to collect a claim which was at least valid in part constitutes neither duress nor fraud, such as will avoid liability on a compromise agreement." Id. § 11, p. 722; Kiler v. Wohletz, 79 Kan. 716, 101 Pac. 474, L. R. A. 1915B, 11.

"It has been held, however, that duress of property cannot exist without there being a threat to do some act which the threatening party has no legal right to do—some illegal exaction, some fraud or deception. The restraint must be imminent and such as to destroy free agency without the present means of protection." Id. § 12, p. 723; York v. Hinkle, 80 Wis. 624, 50 N. W. 895, 27 Am. St. Rep. 73.

The fear that a party will not perform an existing contract according to its terms will not constitute duress. Dickson & Tweeddale v. Fowler, 114 Md. 344, 79 Atl. 519. The threat to sell out one's interest in a partnership, in violation of the articles of partnership, is not such duress as will avoid a note executed by another party for the stock of the partnership so threatened. Taylor v. Ford, 131 Cal. 440, 63 Pac. 770. See, also, Ripy Bros. v. Lillard, 149 Ky. 726, 149 S. W. 1009, with reference to fear from a threatened action, which might cause the servient party to breach a contract. The appellees had no legal right to compel Shelton to make a contract of dissolution or to contract to set over their interest in the property separate from the partnership interest. If there was cause for dissolution and partition, appellees possibly could have forced dissolution by a proper action therefor. They did not urge cause as a ground, but sought an agreement. Certainly Shelton had the right, if such agreement was to be made, to insist and urge his rights or views as to its terms. The appellees had no right to the exclusive possession of the property, or any part of it. One partner has as much right to the possession as another, in the absence of an agreement to the contrary. Partners may agree to put the possession or right to manage and to sell and distribute the proceeds thereof in one member, and when such is the agreement the one so holding the property is not acting illegally, and would not be acting illegally in refusing to deliver the property, or any part of it, so long as the contract giving him that right is in force. Bates on Partnership, § 278. So there could be said to be no duress or coercion, either at law or in equity, in retaining the property under the terms of the partnership agreement and in the refusal to deliver to appellees one-half the property. They had no legal right to then demand it, and a refusal, if there was such, on the part of Shelton, was not illegal.

The contract of partnership stipulated for a continuance for a period of five years, if not sooner dissolved. It was stipulated Shelton had the right to sell the property of the partnership, wind it up, pay the debts, and distribute the proceeds. This right had precedence over dissolution by the terms of the contract, and even if dissolved Shelton still had the right to distribute the proceeds. It was evidently the purpose of the parties entering into the relation of partners that if it should be deemed best not to partition the property, either before dissolution or after, it could be sold and the proceeds divided. They left this question for the determination of Shelton. For nearly four years he had not sought to exercise such rights, but, on the contrary, the undisputed testimony is that he desired to continue the relationship for the full term and insisted that it be so continued. There were certainly reasons that the property, the ranch and cattle, should be held together. The concern had been a success under Shelton's general management. They had paid off more than $500,000 due the syndicate on the purchase of the property; paid the lease money, $60,000 a year, and paid all running expenses, and sufficient had been made to pay the Triggs' note to Shelton for $25,000 and place a credit of $17,000 on the larger note; and in addition to that, a considerable sum had been used to pay off, the evidence indicates, vendors' liens on other property owned by appellees, the amount of which they owed individually, and at the time of the dissolution contract in January, 1916, the evidence shows the value of the partnership net was considerably over $1,000,000, with no incumbrance whatever except the rent under the lease contract, which was not then due. It is admitted by one of the appellees that their interest was near $600,-000, and I understand this did not include the value of the lease, over and above the agreed price paid, 10 cents an acre, some of which had been sublet for 25 cents an acre, and perhaps other property not included in the estimate. It would appear to this date Shelton had done nothing to seriously frighten the other members for the safety of the property, but they wanted an agreement to partition and Shelton wanted the contract to provide and protect the indebtedness and expenses incident to dividing to pay the remainder of the contract on the lease and to protect the syndicate's property and its rights contracted for under the lease, as well as to pay the sum due him under the salary contract, asking, as I understand, that so many cattle be cut out for this purpose and

not partitioned. To this appellees made objections and discuss their objection:

"He (Shelton) said he would not make the contract of dissolution without those provisions; would close out the business first."

In the first place, in my judgment, it is not a threat to close out the business, but is simply a statement that he would not make an agreement omitting those provisions, but would prefer to close the business under the original contract. It implies, if the alternative was up to him to make the agreement demanded or sell and divide the proceeds, he would elect the latter course. But if it was a direct threat, such would not have been unlawful but was in conformity with the terms of the partnership contract, under which for four years the business had been running, such a threat did not, in my judgment, and could not, have amounted to duress or coercion. Railway Co. v. Graham, 145 S. W. 633. D. C. Trigg testified:

"If I didn't agree to this dissolution I believed that he would close me out and take everything I had, as far as it would go, to pay the debts, which would ruin my business."

What debts? The partnership owed nothing except current running expenses. The lease money as it fell due had all been paid, and the partnership was only liable for the quarterly rents as they fell due, none of which were then due. Whether there was a dissolution or not, the partners were jointly and severally liable for the rents. Appellees did not owe Shelton one penny, to which he could apply "everything" they had. There were no debts, either partnership or otherwise, to which Shelton could apply the proceeds in the payment. Appellees so swear, and they must have known it, had they sworn to it. A sane person cannot, as I see it, fear for the safety of his property on account of debts which had no existence. The appellees imply they feared Shelton because he would breach the contract of partnership by taking everything they had and apply to debts which had no existence, and intimate that it would only go a short distance on such debts. The original contract only authorizes Shelton to apply the proceeds on partnership debts and debts owing him. It did not authorize him to pay on debts that did not exist. The presumption is that men will not violate their contracts. Parties cannot build up a man of straw and base their fears on imagination and phantoms of the brain for the purpose of urging coercion. A breach of contract usually is not duress. Silliman v. U. S., 101 U. S. 465, 25 L. Ed. 987. And certainly the fear of such a breach is not a threat to sell out an interest in the partnership, contrary to the contract of partnership. Dickson & Tweeddale v. Fowler, 114 Md. 344, 79 Atl. 519; Taylor v. Ford, 131 Cal. 440, 63 Pac. 770. If the threat to sell was under the power granted by the original

contract, it was not a threat to do an illegal thing. If it is to be interpreted a threat to exercise a power contrary to the contract, it was only a breach of the contract. In either event, it was neither duress nor coercion in law or equity. It is contended the debt at the date of the dissolution contract was an illegal demand. If this shall be admitted, then the threatened safety of the property must be imminent, such as to destroy consent to the contract. The threat, if one, at all, was to exercise the right under the contract, which expressly, as to this obligation, provided that it should be paid out of the partnership assets when the business was wound up. There was no immediate danger of this debt being paid at once. It seems to me that appellees would have been in no worse position, in so far as their property was concerned, by leaving its payment according to the contract, than they were in paying it and then suing for it back in an accounting. The agreement to pay an illegal demand is not always voidable on the ground of duress or sufficient to show duress. In the case of Silliman v. U. S., 101 U. S. 465, 25 L. Ed. 987, it was said, if the claimants had stood upon their contract rights, the government could have been compelled to pay the amount stipulated in the original contract.

"Instead, however, of seeking the aid of the law, claimants, with a full knowledge of their legal rights, executed new charter parties and, from time to time, received payments according to the rates prescribed therein; protesting, when the new agreements were signed, that they were executed against their wishes and under the pressure of financial necessity. They now seek the aid of the law to enforce their rights under the original charter parties, upon the ground that those last signed were executed under such circumstances as amounted, in law, to duress. Duress of, or in, what? Not of their persons; for there is no pretense that a refusal, on their part, to accede to the illegal demand of the Quartermaster's Department would have endangered their liberty or their personal security. There was no threat of injury to their persons or to their property, to avoid which it became necessary to execute new charter parties. Nor were those charter parties executed for the purpose or as a means of obtaining possession of their property. They yielded to the threat or demand of the department solely because they required, or supposed they required, money for the conduct of their business or to meet their pecuniary obligations to others. Their duty, if they expected to rely upon the law for protection, was to disregard the threat of the department, and apply to the courts for redress against its repudiation of a valid contract. We are aware of no authority in the text-books or in the adjudged cases to justify us in holding that the last charter parties were executed under duress."

So, at last, this case comes back to the question, Could appellees demand the agreement, or were they entitled to the possession of one-half of all the property? This, I think, they were not. They therefore entered

into negotiations for an agreement giving them their portion in severalty, to which they otherwise were not entitled. It was upon their initiative and to accomplish their own purpose and design that they entered into the contract, and not upon compulsion from any one. True, they could not get Shelton's assent to an agreement without acceding to his claim for a salary. They therefore assented. They may have done so reluctantly, and may have haggled, but they agreed. There was no reasonable ground to fear for the safety of their interest in the property, and no threat that they had not themselves written into the original contract four years before, and under which they had prospered as a partnership and under which they had earned net to the partnership the princely sum of over $1,000,000. They simply wanted to set up a separate housekeeping. They got this agreement, and now, having received the benefit of the agreement which destroyed the relationship, they cannot be heard to deny its validity and that the payment of the salary was voluntary. Where it appears, as in this case, that the alleged servient party was active in executing the transaction, and was in fact putting through a fixed purpose of his own, coercion or undue influence cannot be said to exist. Borchers v. Barckers, 143 Mo. App. 72, 122 S. W. 357. The above case is one of undue influence, which is closely allied to duress. Duress implies one is coerced against his will. Undue influence denotes the party influenced entered into the contract because of moral, social, or fiduciary relations, so as to control the free action of the will. It must amount to moral coercion. He must be unable to resist. If he is persuaded by argument, affection, or the like, or if actuated by some motive or purpose of his own, then in neither case could he be said to have been morally coerced or placed in duress. Patterson v. Lamb, 21 Tex. Civ. App. 512, 52 S. W. 98.

I again insist that I can find no grounds to base a finding that duress or coercion existed at the time of executing the dissolution agreement, which clearly ratifies the salary contract. There was no financial embarrassment, no immediate danger, no threat to do an illegal act. If there were any debts owing by the appellees the appellant was not responsible for them. The appellees retained all the benefit of the agreement of dissolution and partition for themselves. Upon no just ground can I conceive a right of recovery. French v. Shoemaker, 14 Wall. 314, 20 L. Ed. 852; Sanborn v. Bush, 41 Tex. Civ. App. 24, 91 S. W. 883; Shelton v. Jackson, 20 Tex. Civ. App. 443, 49 S. W. 415. Again, after the contract of 1916 had been entered into, agreeing to hold 1,000 cows out of the partition to meet accruing expenses, debts created, and appellant's claim, and after the parties had proceeded with the partition, appellees desired to annul that part of the contract providing for the holding of 1,000 cows, Shelton said he would not agree to it, but would insist upon it, stop partition, unless his salary was paid, and Trigg agreed to do this. They went to the bank and made arrangements and issued their check. When they did this they say they did so under strict protest, and notified Shelton that the check would be paid but that they would get it back; that their money could not be taken in any such manner. This was dramatic, but a little belated. It has the appearance to me of laying in wait. The partnership first got Shelton's extra service for over two years and released D. C. Trigg from his obligation to do labor and work on the ranch. Appellees then got partition of all property except the cows to be held to pay this debt and other obligations. They then got Shelton to agree to waive the latter provision and accept payment of the salary. After all this, then to announce that they would get that back does not appeal to me as presenting an equitable ground for recovery, and certainly this must be true when they failed to place the parties in statu quo. I thing the contract of dissolution is shown to have been voluntarily entered into and the payment voluntarily made, and the salary contract fully ratified. It is my view that the following cases support such position: Galveston City Co. v. Galveston, 56 Tex. 494; Davies' Ex'rs v. City of Galveston, 16 Tex. Civ. App. 13, 41 S. W. 146; Andrews v. Connolly (C. C.) 145 Fed. 43; Little v. Bowers, 134 U. S. 547, 10 Sup. Ct. 620, 33 L. Ed. 1016; Silliman v. U. S., 101 U. S. 465, 25 L. Ed. 987; Wood v. Kansas City Telephone Co., 223 Mo. 537, 123 S. W. 6; Railway Co. v. Forrest, 128 N. Y. 83, 28 N. E. 137; Connolly v. Bouck, 174 Fed. 314, 98 C. C. A. 184; Miller v. Davis, 52 Colo. 485, 122 Pac. 793; Hall v. Bollen, 148 Ky. 20, 145 S. W. 1136, Ann. Cas. 1913E, 436; Crook v. Tensas Basin Levee Dist., 51 La. Ann. 285, 25 South. 88; Hughes v. Leonard (Colo.) 181 Pac. 200, 5 A. L. R. 817, on page 822. On the question of consideration for the dissolution contract, I consider the dissolution partition and ratification all one contract. By the testimony of the appellees they made overtures to Shelton for an agreement to dissolve and partition at that time, and the consideration for the agreement was to allow the salary contract. Shelton performed his part of the agreement; they repudiated theirs. The mutual covenants and obligations were sufficient to support this contract. Each party obtained his interest in the property separate from the partnership, and I think this is a sufficient consideration for the dissolution contract. There were several other covenants and obligations mutually binding, which will support the contract. Aside from this, the original salary contract was supported by a consideration, and when it was ratified the ratification had a retroactive effect and related back to

the original transaction and to its inception and makes that contract as obligatory as if originally made without coercion, and the consideration for the first contract supports the ratification. Brock v. Jones' Ex'r, 16 Tex. 461; Railway Co. v. Chandler, 51 Tex. 416.

As to the maintenance account, I concur in the holding that the estoppel was not conclusively established, and there was no error in submitting the issue and in refusing to take it from the jury.

RANDOLPH, Special Judge. I concur in the disposition of this case as set out in the opinion of Associate Justice HALL.

With the question of the unconscionableness of the contract known as the "partnership contract" this court has nothing to do, as no issue presented calls in question such partnership contract. The only questions before this court are the questions of duress, with the incidental issues—estoppel and ratification—and whether or not the last question is in such form that this court can pass upon it.

Duress of property threatened is the issue here presented. That a party may invoke the threatened duress as a basis for recovery or as a defense, he must have had reasonable belief that the other party had the power to carry his threat into execution.

What constitutes duress invalidating a contract is a question of law for the court, and whether facts sufficient to constitute it exist is for the jury. Kansas, etc., Ry. Co. v. Graham, 145 S. W. 632.

In this case the evidence shows that there was an original partnership contract under which plaintiffs and defendant operated the ranch; that some two years after the signing of the partnership contract there was executed in January, 1914, what is known in the record as the "salary contract." In January, 1916, there was executed by the parties what is known as the "dissolution contract."

The plaintiffs attack the salary contract on the ground of duress of property. If there was duress, as found by the jury, and which I think the evidence sustains, then this duress continued up to the very time of the final division of the property, to wit, December 1, 1916. Consequently there is no bar of limitation to this action.

If the facts which I think constitute the duress in this case, i. e., the threat to close out the business and sell the property upon his own terms and conditions, as made by defendant and as provided for in the original partnership contract, existed, then this state of facts continued until the final partition and distribution of the partnership assets.

I am of the opinion that the threat of the defendant to close the partnership affairs, under the conditions and circumstances in this case, warranted the jury in finding that there was such duress of property as is contemplated by law before a party can successfully interpose same as a defense, or recover upon same as a cause of action.

In the case of Caldwell v. Auto Sales, etc., Co., 158 S. W. 1030, the court holds:

"In an action upon a check given by defendant to pay for repairs to his automobile, where plaintiffs by unlawfully withholding possession of the machine compelled the giving of a check for a larger amount than that which was really due, their good faith in enforcing a claim, in fact improper, will not affect defendant's right to set up duress as a defense."

In the case of Harris v. Cary, 112 Va. 362, 71 S. E. 551, Ann. Cas. 1913A, 1350, it is held by the court that a threat on the part of those in control of a corporation to refrain from paying the debts of such corporation and to permit its property to be sold for the payment of such debts may amount to duress of a minority stockholder who is induced, by such threats, to enter into a contract with those who are in charge of such corporation as a means to save his interest in the corporation.

There being evidence to support plaintiffs' claim of duress, and the jury having found the same as a fact, I am of the opinion that such finding should be affirmed.

It has been held that acts done under duress do not validate an instrument given under duress. St. L. & S. F. Ry. Co. v. Gorman, 79 Kan. 643, 100 Pac. 647, 28 L. R. A. (N. S.) 637.

If duress existed at the time of the signing of the salary contract and at the time of the signing of the dissolution contract, then no act of the plaintiffs, as long as those conditions existed, could be urged as a ratification. The act which is relied upon as a ratification must be one which shows unequivocally that the party who was subjected to duress has determined, after he has become a free agent, to treat the transaction as valid. Page on Contracts, § 507, p. 826.

Also, in determining whether the party is guilty of laches in bringing a suit to set aside a conveyance made under duress, the time during which his mind was affected by such threats will not be regarded. Wilson v. Calhoun, 170 Iowa, 111, 151 N. W. 1087; Hoag v. Hoag, 210 Mass. 94, 96 N. E. 49, 36 L. R. A. (N. S.) 329.

The influence of duress must be removed before there can be ratification, and an intention to confirm a previous contract or agreement which was not binding, and make it a valid and binding contract, must appear.

I take it that the question is not presented to this court of a party accepting the benefits of a contract in so far as it does benefit him and rejecting its onerous provisions. Rather, the question is present whether or not the plaintiffs can insist on the original partnership contract with its benefits and losses,

and reject a "rider" afterwards attached under duress.

However, there is one phase of this case which, in my opinion, absolutely eliminates the question of ratification. No issue of ratification was submitted by the court. No such issue was presented to the court by the defendants, and no finding was had upon any such issue.

Article 1985, vol. 2, p. 1552, of Vernon's Sayles' Texas Civil Statutes 1914, is as follows:

"*Special verdict, requisites of; failure to submit issue not reversible error unless request,* etc.—The special verdict must find the facts established by the evidence, and not the evidence by which they are established; and it shall be the duty of the court, when it submits a case to the jury upon special issues, to submit all the issues made by the pleading, but the failure to submit any issue shall not be deemed a ground for reversal of the judgment, upon appeal or a writ of error, unless its submission has been requested in writing by the party complaining of the judgment. Upon appeal or writ of error, an issue not submitted and not requested by a party to the cause, shall be deemed as found by the court in such manner as to support the judgment: Provided, there be evidence to sustain such a finding."

The lower court might well have concluded that duress existed to the 1st of December, 1916, when the final distribution of the partnership assets occurred, and that there could be no ratification while duress continued. Lancaster v. Richardson, 45 S. W. 409; Phœnix Ins. Co. v. Moore, 46 S. W. 1131; Devine v. U. S. Mtg. Co., 48 S. W. 585; Texarkana, etc., Ry. Co. v. Spencer, 28 Tex. Civ. App. 251, 67 S. W. 196; Massie v. Hutchison et al. (Sup.) 222 S. W. 962.

I cannot assent to Judge HUFF's statement that—

"The facts show that there was abundant consideration for the contract of January 5, 1914. D. C. Trigg was released from his obligation to contribute his work and labor in handling the business and caring for the cattle on the ranch, and to relieve him of a charge for a substitute in case he did not furnish an adequate amount of work or labor."

On the contrary, I think the facts show he was denied the right given him by the contract to take part in or exercise any discretion in the conduct of the affairs of the partnership, where his money was invested and his credit involved; nor, in my opinion, do the facts show that he was relieved of a charge for a substitute legally appointed; on the contrary, he is asked to pay to the usurper of his prerogative an exorbitant wage, fixed by such usurper. As stated in the majority opinion, the conditions did not exist when under the contract a substitute could be appointed. Shelton has never asserted D. C. Trigg was not doing "an adequate amount" of work, but he seeks to jus-

tify his arbitrary action by claiming that Trigg was not doing it right. In that event, his sole prerogative was to direct him how to do it. The specific complaint made by Shelton was that Trigg did not have sense enough to feed a bunch of cattle. The evidence is uncontradicted that when Shelton told him how he wanted them fed Trigg obeyed him to the letter. Before I can agree with Judge HUFF in this particular, I would have to disregard the findings of the jury, ignore the plain letter and spirit of the partnership contract, and refuse to accept as true uncontradicted testimony. I have found no evidence in the record that Shelton assumed and performed D. C. Trigg's duties with the latter's consent. In fact, the evidence is practically all to the contrary, and the findings of the jury settle that issue against Judge HUFF'S holdings. For that reason, the rule in Hooker v. Williamson, 60 Tex. 524, does not apply.

This record is barren of any reason why Shelton refused to dissolve the partnership and divide the property except the fact that he was drawing a handsome salary for doing what his ousted partner was ready and anxious to do. The evidence is conclusive that the Triggs could get the necessary funds to pay their part of the firm's debts and to relieve Shelton from any further liability therefor; yet he refused to dissolve, and by his threats, as the jury found, coerced them into signing the salary contract and the dissolution contract. I cannot agree that there is any element of consideration in this.

Judge HUFF seems to rest his dissent largely upon the rule that—

"It is never duress to threaten to do what a party has the legal right to do."

This rule has been criticized and modified, and I think the modern and true doctrine is correctly stated in 2 Elliott on Contracts, par. 1384, in this language:

"It is well settled, however, that money extorted or involuntarily paid under duress, or unlawful compulsion, may be recovered. To enable the party making the compulsory payment to recover it, the compulsion must have been illegal, unjust, or oppressive. To constitute the coercion, or, duress, which would be regarded as sufficient to make a payment involuntary, there must be some actual threat exercised of power possessed, or believed to be possessed, by the party exacting or receiving the payment, over the person or property of another, from which the latter has no other means of immediate relief than by making the payment."

Under the rule as stated by the eminent author, duress exists when the threat is either illegal, unjust, or oppressive. The extraordinary power given Shelton by the contract authorized him to sell the cattle whenever, wherever, and in such manner as he saw fit. He might have thrown them upon

the market at an unfavorable season; he could, without violating the letter of the contract, sell them to any confidential friend, or friends, and for such price and in such numbers as he should determine, or sell them at a time and place when competition in bidding would have resulted in a sacrifice of Trigg's interest. It appears from the record that, in order to procure money to pay Shelton for their interest in the property and to settle debts of the partnership, they had executed a mortgage upon their interest in the cattle. An arbitrary sale by Shelton might have brought their creditor, the bank, down upon them at an unfavorable time, resulting in a forced sale and possibly a great loss. A sale under such conditions might not have been a violation of the letter of the contract and in such sense illegal, but that it would have been unjust and oppressive is obvious. In the event Shelton should exercise his power of sale fairly and justly to his partners, and within the limits of the powers granted him, his conduct could not be called illegal, and a threat to sell under such conditions woud not constitute duress of property. But I think it will not be controverted that a threat to sell unless the Triggs agreed to pay him a sum which he had no right to demand, either under the contract or as a matter of law, would render the threat itself, not only unjust and oppressive, but illegal.

Nor can I assent to Judge HUFF'S conclusion of fact that the Triggs entered into the partnership agreement without compulsion. It is not clear from the oral testimony of the witnesses whether the contract of purchase from the syndicate and the partnership contract were executed simultaneously. It seems to me, however, that the first paragraph of the partnership contract, reciting that the parties "have this day, by written instrument, entered into a contract with the Capital Freehold Land & Investment Company, Limited, for the purchase of certain cattle and other personal property, and for the leasing of certain lands therein described, and to which reference is hereby made for a more particular description, and also referring herein to covenants and stipulations therein expressed as to the liability of the parties herein mentioned upon that contract," is almost conclusive that the contract of purchase had been executed. By the terms of that contract the Triggs were equally bound with Shelton to pay an enormous sum of money, which the whole record shows they were not able to pay and for which, according to the partnership contract, Shelton was primarily liable. It requires no argument to prove that a refusal upon their part to sign the partnership contract would have meant their financial ruin.

I therefore concur in the opinion of Judge HALL.